**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SYMETRA LIFE INSURANCE CO., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| NATIONAL ASSOCIATION OF | § | |
| SETTLEMENT PURCHASERS, | § | |
| | § | |
| Intervenor, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-05-3167 |
| | § | |
| RAPID SETTLEMENTS, LTD., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This case arises from the secondary market in structured settlement payment rights. The National Association of Settlement Purchasers ("NASP") intervened in the suit that Symetra Life Insurance Co. and Symetra Assigned Benefits Service Co. (together, "Symetra") brought against Rapid Settlements, Ltd. In that suit, Symetra sought a preliminary and permanent injunction preventing Rapid Settlements from using arbitration to circumvent the requirements of the state structured settlement protection statutes. On January 10, 2007, this court preliminarily enjoined Rapid Settlements "from using arbitration to resolve disputes between it and any Symetra annuitant, if that arbitration, directly or indirectly, effects a transfer of all or part of the annuitant's future-payment stream, unless a state court has approved the transfer as required under the applicable state structured settlement protection act." (Docket Entry No. 84). This injunction was made permanent on March 31, 2008. (Docket Entry No. 240).

NASP also applied for an injunction against Rapid Settlements.  NASP sought to enjoin Rapid Settlements from "(1) circumventing state law by effectuating a transfer of structured settlement payment rights through arbitration rather than complying with state transfer statutes, (2) attempting to enforce alleged rights of first refusal and/or security interests in an annuitant's structured settlement payment rights without first expressly seeking and receiving court approval under an applicable state transfer statute, and (3) attempting to enforce such unlawfully procured rights of first refusal, security interests and arbitration awards against individual NASP members." (Docket Entry No. 206 at 2–3).  Rapid Settlements responded, (Docket Entry No. 228), and NASP replied, (Docket Entry No. 239).  This court held a four-day evidentiary hearing on NASP's injunction application.  (Docket Entry Nos. 235, 236, 237, 238).  While this case was under advisement, the Fifth Circuit Court of Appeals affirmed the injunction issued against Rapid Settlements's use of arbitration to circumvent the requirements of the state structured settlement protection acts.

Based on the motions and replies, the record, the parties' submissions, and the applicable law, NASP's application for a permanent injunction is granted.  The reasons for this ruling are explained in detail in the findings of fact and conclusions of law set out below.  A permanent injunction order is separately entered.

## I.    Background

### A        The Secondary Market in Structured Settlements

In the secondary market in structured settlements, tort claimants who have settled their claims by entering into structured settlements paid through an annuity transfer some or all of their future-payment rights to a "factoring company" in exchange for a discounted lump sum paid in the

present.  The legislatures of forty-six states, including Texas, have enacted similar versions of a model statute to regulate these secondary-market transactions.[1]  These paternalistic statutes, frequently referred to as "structured settlement protection acts" ("SSPAs"), typically require the factoring company to disclose fully the effects of the proposed transfer and require a state-court judge to decide whether to approve the transfer as in the best interests of the annuitant.  The purpose of the SSPAs is to protect annuitants from overreaching by factoring companies and to ensure that the decision to give up future-payment streams in exchange for a present discounted lump-sum payment is informed and voluntary.

The state SSPAs typically require a hearing and court approval of any "direct or indirect transfer of structured settlement payment rights" before the proposed transfer of such rights has any legal effect.[2]  *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 141.004.  "Structured settlement payment rights" are often defined as "rights to receive periodic payments under a structured settlement."  *Id.* § 141.002(16).  "Transfer" is defined as:

> any sale, assignment, pledge, hypothecation, or other alienation or encumbrance of structured settlement payment rights made by a payee for consideration, except that the term does not include the creation or perfection of a security interest in structured settlement payment rights under a blanket security agreement entered into with an insured depository institution, in the absence of any action to redirect the structured settlement payments to the insured depository institution, or its agent or successor in interest, or to enforce the

---

[1]  A forty-seventh state, North Dakota,  recently passed a structured settlement protection statute that will become effective August 1, 2009.  See N.D. Cent. Code § 32-03.4-01, *et seq.*  New Hampshire, Vermont, and Wisconsin have not enacted structured settlement protection acts.

[2]  In twenty-four states, the requisite approval may also be granted by a "responsible administrative authority."  These states include Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Georgia, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Minnesota, Mississippi, Montana, New Jersey, North Carolina, Oklahoma, Oregon, South Dakota, Tennessee, Virginia, and Washington.

> blanket security interest against the structured settlement payment
> rights.

*Id.* § 141.002(18).

The SSPAs typically require that the party seeking approval of the transfer serve a written disclosure on the annuitant.  *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 141.003.[3]  A copy of this disclosure statement must be filed with the court at least twenty days before the scheduled hearing to confirm the transfer agreement, along with a copy of the transferee's application, a copy of the transfer agreement, and a listing of each of the payee's dependents and their ages.  *Id.* § 141.006(b).

---

[3]  Section 141.003 sets out the required contents of the disclosure statement.  It provides:

> At least three days before the date on which the payee signs a transfer agreement, the transferee shall provide to the payee a separate disclosure statement, in bold type at least 14 points in size, that states:
>
> (1)  the amounts and due dates of the structured settlement payments to be transferred;
> (2)  the aggregate amount of that payments;
> (3)  the discounted present value of the payments to be transferred, which shall be identified as the "calculation of current value of the transferred structured settlement payments under federal standards for valuing annuities," and the amount of the Applicable Federal Rate used in calculating the discounted present value;
> (4)  the gross advance amount;
> (5)  an itemized listing of all applicable transfer expenses, other than attorney's fees and related disbursements payable in connection with the transferee's application for approval of the transfer, and the transferee's best estimate of the amount of those expenses;
> (6)  the net advance amount;
> (7)  the amount of any penalties or liquidated damages payable by the payee in the event of any breach of the transfer agreement by the payee; and
> (8)  a statement that the payee has the right to cancel the transfer agreement, without penalty or further obligation, not later than the third business day after the date the agreement is signed by the payee.

TEX. CIV. PRAC. & REM. CODE § 141.003.

A court order approving a transfer under an SSPA typically must make "express findings" that:

> (1)    the transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents;
>
> (2)    the payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received the advice or knowingly waived the advice in writing; and
>
> (3)    the transfer does not contravene any applicable statute or an order of any court or other governmental authority.

*See, e.g., id.* § 141.004. The purpose of the "best interest" finding is to make sure that the annuitant does not give up the right to the future-income stream in exchange for a much smaller present payment without good reason. *See Settlement Capital Corp. v. BHG Structured Settlements, Inc.*, 319 F. Supp. 2d 729, 734 (N.D. Tex. 2004). "This maintains the purpose and reason for the structured settlement while at the same time allowing for changed circumstances that may warrant exchanging future income for current income." *Id.*

In 2002, Congress enacted federal legislation directed at reinforcing the state SSPAs. Under this legislation, the Internal Revenue Code imposes a forty percent federal excise tax on any party that acquires payment rights in a "structured settlement factoring transaction" that does not receive court approval required by an applicable statute. 26 U.S.C. § 5891(a). The statute exempts from the federal excise tax transactions that are approved in advance by a "qualified order." 26 U.S.C. § 5891(b). A "qualified order" is defined as:

> a final order, judgment, or decree which (A) finds that the transfer . . . (I) does not contravene any Federal or State statute or the order of any court or responsible administrative authority, and (ii) is in the best interest of the payee, taking into account the welfare and support of the payee's dependents, and (B) is issued (I) under the

> authority of an applicable State statute by an applicable State court,
> or (ii) by the responsible administrative authority (if any) which has
> exclusive jurisdiction over the underlying action or proceeding which
> was resolved by means of the structured settlement.

26 U.S.C. § 5891(b)(2).  The Internal Revenue Code exemption requirements dovetail with and implement the two primary requirements for an effective transfer under the state SSPAs: to avoid the excise tax, the proposed transfer must affirmatively be approved by a state court under the applicable state structured settlement protection statute.

The SSPAs do not apply to contracts transferring structured settlement future-payment rights that were entered before these laws were enacted.  *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 141.007(e) ("Nothing contained in this chapter may be construed to . . . imply that any transfer under a transfer agreement entered into before the effective date of this chapter is valid or invalid.").  The federal excise tax does not apply retroactively.  Only transfer agreements entered after the effective dates of the SSPAs and federal excise tax are subject to this legislation.

### B.    The Parties

NASP is a Virginia nonprofit trade association of factoring companies engaged in secondary market transactions.  NASP was organized around 1999, when federal and state lawmakers were considering proposals that would regulate or eliminate the structured settlement secondary market industry.  NASP participated in extensive research and advocacy  efforts at the federal and state levels that were critical to the passage of the SSPAs and the federal excise tax legislation.  According to NASP, the legislative balance that it worked to achieve provides protections to annuitants while allowing the structured settlement secondary market industry to continue.  (Docket Entry No. 235 at 28–40).  NASP has a Code of Ethics that it imposes on its members as a condition

of membership.  The Code of Ethics requires adherence to the SSPAs and to federal law.  It

provides:

> A)     Members shall follow and adhere to all state and federal
> statutory law applicable to the transfer of structured
> settlement payments;
>
> B)     Members shall not purchase structured settlement payments
> unless the transaction has been approved in advance by a
> court or administrative agency;
>
> C)     Members shall not knowingly purchase worker's
> compensation payments or broker such transactions to a non-
> member.

(NASP Binder, Ex. 2; Docket Entry No. 235 at 61–63).  There are about two dozen companies in

the factoring industry, approximately fifteen of which are NASP members.  (Docket Entry No. 238

at 95–96).

Rapid Settlements is a factoring company formed in 2003.  (Docket Entry No. 237 at 11–12).

Rapid Settlements is not a NASP member.  Its business practices led NASP to ask Rapid Settlements

not to apply for membership.[4]  (*Id.* at 33–34).

---

[4]  At the injunction hearing, Stewart Feldman, the president and CEO of Rapid Settlements and its lawyer,
speculated that Rapid Settlements is the target of litigation because it is a relatively new entrant into the
factoring industry and the current industry members do not welcome the competition. (Docket Entry No. 237
at 34).  Much of the litigation has been filed by Rapid Settlements itself, in connection with its efforts to use
court orders based on arbitration awards and contractual provisions to avoid the state structured settlement
act requirements.  NASP's president, Robin Shapiro, testified that Feldman's speculation about NASP's
attitude toward new members generally was false.  Shapiro testified that NASP has welcomed "five or six
new members in the past several years," several of which were new entrants to the factoring industry.
(Docket Entry No. 238 at 94–95).  The new entrants included Oasis Legal, Northeastern, and Patriot.  (*Id.*).

Feldman also alleged that there was "longstanding discomfort or dislike" between NASP member
Settlement Capital Corp. and Rapid Settlements, and that it was Settlement Capital's principal who in his
previous position as president of NASP made the decision to intervene in Symetra's litigation against Rapid
Settlements. (Docket Entry No. 237 at 23).  Feldman clarified on cross-examination that there were hostilities
between the companies because Feldman formed and began to operate Rapid Settlements while his law firm,
The Feldman Hanson Firm, was still representing Settlement Capital—a move that Settlement Capital

## II.     The Evidence as to Rapid Settlements's Practices

At the injunction hearing, NASP presented three witnesses: Robin Shapiro, the president of NASP and CEO of Novation Capital Corp.; David Reape, an executive vice-president of NASP-member J.G. Wentworth, LLC, and of two of the company's subsidiaries, J.G. Wentworth Subsidiaries and 321 Henderson Receivables (also a NASP member); and Gregory Hall, the sales manager for First Providen, a factoring company and NASP member.  Rapid Settlements presented one witness, its president, CEO, and one of its lawyer, Stewart Feldman.

The four-day evidentiary hearing on NASP's injunction application was in addition to a two-day evidentiary hearing on Symetra's permanent injunction application, which addressed many of the same issues.  Both Symetra and NASP sought to enjoin Rapid Settlements from using arbitration to effectuate transfers of future-payment streams without obtaining court approval under the SSPAs. At the Symetra injunction hearing, the parties presented witnesses and submitted documents relating to annuitants against whom Rapid Settlements had used arbitration to effectuate transfers.  At the four-day NASP injunction hearing, the parties agreed that the evidence presented in the Symetra hearing about Rapid Settlements's use of arbitration to effect transfers of future-payment streams from Symetra annuitants could be used in deciding NASP's application for injunctive relief.  The evidence from the hearing on Symetra's application for an injunction, and the findings and conclusions based on that evidence, are set out in detail in this court's March 31, 2008 opinion. (Docket Entry No. 240).

The four-day injunction hearing on NASP's application included evidence on the arbitration issue but focused primarily on NASP's challenge to Rapid Settlements's enforcement of rights of

---

believed to be a breach of fiduciary duty.  (*Id.* at 117–19).

first refusal and security interests acquired in transfer agreements not approved by a state court

under the applicable SSPA.  The parties also presented extensive testimony and numerous exhibits

on Rapid Settlements's "unclean hands" defense.

> **A.     The Evidence as to Rapid Settlements's Arbitration Practices**

The record shows that Rapid Settlements enters into proposed transfer agreements with

annuitants that purport to transfer the annuitants' future-payment rights to Rapid Settlements in

exchange for a lump-sum payment, called an "Assignment Price."   The proposed transfer

agreements state that they are "subject to court approval":

> A court must approve Assignor's sale, assignment, and transfer to
> Rapid Settlements of the Assigned Payments before such payments
> can be transferred and the Assignment Price . . . paid to Assignor.
> The Final Order shall state that the court at least has made all
> findings required by applicable law, and that Annuity Owner and
> Annuity Issuer are authorized and directed to pay the Assigned
> Payments to Rapid Settlements, its successors and, or assigns.
> Assignor and Rapid Settlements agree to proceed in good faith to
> obtain court approval of this Transfer Agreement.

(Docket Entry No. 228, Ex. A, Preliminary).  The Rapid Settlements proposed transfer agreements

contain broad arbitration clauses, as follows:

> This Agreement shall be governed by and construed and enforced in
> accordance with the laws of the State of Texas.  Any dispute or
> disagreement arising under this Agreement of any nature whatsoever
> including but not limited to those sounding in constitutional,
> statutory, or common law theories as to the performance of any
> obligations, the satisfaction of any rights, and/or the enforceability
> hereof, shall be resolved through demand by any interested party to
> arbitrate the dispute and shall submit the same to a nationally
> recognized, neutral, arbitration association for resolution pursuant to
> its single arbitrator, expedited rules. . . .   The arbitration decision
> shall be final and binding in all respects and shall be non-appealable.
> Any person may have a court of competent jurisdiction enter into its
> record the findings of such arbitrators for all purposes, including the
> enforcement of the award.  In any event, the parties to this Agreement

> hereby waive the right to trial by jury in any action or proceeding instituted with respect to this Agreement.

(*Id.*, Ex. A ¶ 11(a)).  The transfer agreements also contain a severability clause, which states: "If any provision of this Agreement is found to be invalid or unenforceable, the validity or enforceability of any other provision of this Agreement shall not be affected thereby." (*Id.*, Ex. A ¶ 11(c)).

The record established in the hearings on Symetra's and NASP's applications for injunctive relief shows that Rapid Settlements uses the arbitration clause in its transfer agreements to effectuate a transfer of future-payment rights without state-court approval.  If state-court approval of a proposed transfer is not obtained—either because a state trial or appellate court rejects the proposed transfer, or because Rapid Settlements does not seek state-court approval at all—Rapid Settlements invokes the arbitration provision in the proposed transfer agreement, alleging breach of some provision in that agreement.  In some cases, Rapid Settlements alleges breach because the annuitant has failed to meet the state court's conditions for approving the transfer, or because the annuitant cancelled the contract after state-court denial of the transfer.  (Docket Entry No. 32, Ex. 2; Symetra Binder 2, Ex. 9.3).  In other cases, Rapid Settlements alleges breach because an annuitant fails to repay an "advance" on the transfer agreement Rapid Settlements gave the annuitant before (or in at least one case, after) a state-court proceeding in which approval was denied.  (Docket Entry No. 47, Exs. 7, 18; Symetra Binder, Ex. 7.2).

The arbitration usually occurs in Houston, Texas, even though the annuitant usually lives in a distant city.  The annuitant usually appears by telephone, without a lawyer.  The same arbitrators, selected by Rapid Settlements, usually preside.  In most arbitrations, Rapid Settlements reaches an agreement with the customer and prepares an agreed award for the arbitrator's signature.  Rapid

Settlements drafts the agreed arbitration award to contain language similar or identical to the language found in court orders approving transfers.  (Docket Entry No. 213 at 180–81, 216).

For a period, in arbitration, Rapid Settlements would request the same transfer as in the parties' proposed transfer agreement.  (*Id.* at 59).  Arbitration awards from these older arbitrations have some variation in language, but generally purport to approve the transfer agreement and state that the necessary requirements for approval have been met.  In July 2006, after meeting resistance from annuity issuers, Rapid Settlements stopped requesting a transfer of the same payments it would have received under the proposed transfer agreements.  Instead, Rapid Settlements termed the relief it sought in arbitration as "damages" for lost profits from the breach of the proposed transfer agreement and attorney's fees and costs incurred in collecting those "damages."  (*Id.*).  Because Rapid Settlements calculated damages based on the assumption that a state court would have approved the proposed transfer, the lost-profits damages award usually had the same financial effect as if the proposed transfer agreement had been approved under the applicable SSPA.  (*Id.* at 34, 50).  Although styled as "damages awards" for breach of contract, Rapid Settlements's newer arbitration awards required the annuity issuer to pay Rapid Settlements the same payments that Rapid Settlements would have received under the proposed transfer had the necessary state-court approval been obtained under the applicable SSPA.

The arbitration awards that Rapid Settlements obtains contain language asserting that the rights transferred in arbitration comply with the applicable SSPAs:

> The transfer of the Assigned Payments . . . as described in the petition in this matter complies with all substantive and procedural requirements of the [applicable SSPA] (recognizing that this matter is being heard in arbitration) and does not contravene any applicable law.  Notice of this hearing was sent to all interested parties in compliance with [the applicable SSPA].  The transfer also satisfies

the Internal Revenue Code Section 5891, and does not contravene
any Federal or State statute or the order of any court or responsible
administrative authority.

(NASP Binder, Ex. 10 at 5).  By this language, Rapid Settlements attempts to obtain the federal

income-tax benefits that are linked to state court approval under the SSPAs, despite the fact that

such approval has either been refused or simply not obtained.  Rapid Settlements then takes the

arbitration awards to the state court and seeks confirmation and the entry of final judgment.

This court's prior opinions discussed Rapid Settlements's use of arbitration against

annuitants Candy Ann Richardson, Paul Patterson, Kenneth Gross, Thomas Remedies, Mary

Foreman, Leslie Dean, Robert Hargette, Abigail Dempsey, Robert Ayars, and Troy Walker to

effectuate transfers of structured settlement payment rights.  (Docket Entry No. 84 at 11–30; No. 240

at 15–22).  Rapid Settlements's use of arbitration against two additional annuitants is consistent with

the pattern of which NASP complains.

Lucille Harrod has an annuity issued by Fidelity and Guaranty Life Insurance Company

("F&G Life") that entitles her to receive $512.05 per month.  *See Fidelity & Guaranty Life Ins. Co.

v. Harrod*, No. Civ. CCB-2732, 2007 WL 2847966, at *1 (D. Md. Sept. 27, 2007).  In April 2004,

Rapid Settlements contracted with Harrod to purchase certain of her future-payment rights.  Rapid

Settlements advanced Harrod $1,000.00 in cash, secured by a promissory note that granted Rapid

Settlements a security interest in all of the annuity payments that Rapid Settlements had contracted

to buy from Harrod.  According to Rapid Settlements, Harrod then refused to proceed with the

transfer agreement.  At no time did Rapid Settlements seek court approval of that transfer under the

SSPA.  *Id.* at *1.  Later in 2004, Harrod entered into an agreement with Settlement Funding, LLC

d/b/a Peachtree Settlement Funding ("Peachtree"), to transfer substantially the same payments

12

Harrod had previously agreed to transfer to Rapid Settlements.  Peachtree did seek the necessary state-court approval under the SSPA.  A Florida state court approved the transfer on October 7, 2004.  Rapid Settlements then initiated an arbitration proceeding in Texas against Harrod and F&G Life.  Rapid Settlements based the arbitration on Harrod's failure to pay the $1,000.00 secured by the promissory note and sought as damages all the payments that Peachtree had contracted to purchase from Harrod.  Rapid Settlements sought to compel F&G Life to direct the payments that were to go to Peachtree under the Florida court order to Rapid Settlements.  F&G Life filed an interpleader action in Maryland district court to determine its obligations and Peachtree was included as a party.  Peachtree was required to litigate for almost a year before prevailing on summary judgment.  In April 2008, Peachtree was still litigating its motions for sanctions and attorneys' fees against Rapid Settlements.  *See Fidelity & Guaranty Life Ins. Co. v. Harrod*, No. CCB-05-2732, 2008 WL 2246518 (D. Md. Apr. 15, 2008).

NASP also presented evidence as to an annuitant named Bankston.  Robin Shapiro testified that in 2007, his company, Novation, "walked away" from a proposed transfer of Bankston's future payment rights because of a Rapid Settlements arbitration.  Rapid Settlements informed Novation that the payments it was about to purchase from Bankston had already been conveyed to Rapid Settlements through an order entered in arbitration, with no court approval under the applicable SSPA.  (Docket Entry No. 235 at 59–61).

NASP makes the same arguments that Symetra made about the improper use of arbitration to effect transfers of annuitants' structured settlement payment rights by circumventing the requirements of the SSPAs.  NASP adds to those arguments that by using arbitration in this manner, Rapid Settlements clouds the title to annuitants' structured settlement payment rights, raises the

transaction costs for NASP members who enter transfer agreements with annuitants who have previously entered into transfer agreements with Rapid Settlements, and discourages NASP members from entering into such transactions in the first place.  NASP also contends that the practice puts its members, who do comply with the requirement of obtaining state-court approvals of a proposed transfer as in the "best interests" of the annuitants, at a competitive disadvantage. (Docket Entry No. 206 at 3; No. 235 at 14–16).  NASP further contends that the Rapid Settlements arbitration practices could prompt lawmakers to institute more restrictive regulations of the entire structured settlement secondary market industry, putting at risk the legislative balance that NASP worked to achieve.  (*Id.*).  A growing number of courts have concluded that Rapid Settlements's use of arbitration violates the SSPAs.[5]

## B.    The Defenses Asserted by Rapid Settlements

Rapid Settlements contends that its practice of invoking arbitration to effect transfers of annuitants' future-payment rights is consistent with the Federal Arbitration Act, which Rapid Settlements alleges preempts the SSPAs.  Rapid Settlements also contends that the arbitration awards it obtains are not "transfers" under the SSPAs and therefore are not subject to the requirements of the SSPAs.  Finally, Rapid Settlements argues that the SSPAs "seem[ ] to contemplate the availability of arbitration" and that this court should "give meaning" to this

---

[5]   *See Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, --- F.3d --- , 2009 WL 1277736 (5th Cir. May 11, 2009); *Allstate Life Ins. Co. v. Rapid Settlements Ltd.*, No. 08-60685, 2009 WL 1175534 (5th Cir. May 1, 2009) (unpublished); *Allstate Settlement Corp v. Rapid Settlements, Ltd.*, 559 F.3d 164 (3d Cir. 2009); *Pacific Life Ins. Co. v. Rapid Settlements, Ltd.*, 309 F. App'x 459 (2d Cir. 2009); *R&Q Reins. Co. v. Rapid Settlements, Ltd.*, No. 06-14329-CIV, 2007 WL 2330899 (S.D. Fla. Aug. 13, 2007); *Rapid Settlements, Ltd. v. Green*, --- S.W.3d ---, 2009 WL 1688385 (Tex. App.–Houston [1st Dist.] 2009, no pet. h.); *Transamerica Occidental Life Ins. Co. v. Rapid Settlements, Ltd.*, --- S.W.3d ---, 2008 WL 5263265 (Tex. App.–Houston [1st Dist.] 2008, no pet.).

language.  (Docket Entry No. 228 at 5).  All of these arguments were raised, and rejected, in the proceedings between Rapid Settlements and Symetra.  (Docket Entry Nos. 84, 240).  These arguments have also been rejected by the Fifth Circuit.  (Docket Entry No. 251).

Rapid Settlements also advances an unclean hands defense, arguing that NASP members also have clauses in their proposed transfer agreements that require arbitration of disputes.  Rapid Settlements, however, has not alleged or presented any evidence that NASP members have invoked arbitration clauses in transfer agreements not approved by a state court under the applicable SSPA, or used arbitration to effectuate the transfer of future-payment rights in circumvention of the requirement of state-court approval under the applicable SSPA.

Rapid Settlements also asserts that NASP members take legal action to recoup "advances" given to annuitants if a court does not approve the proposed transfer.  Robin Shapiro, the current president of NASP and the CEO of Novation, a NASP member, testified at the injunction hearing that his company will sometimes provide advances to annuitants pending court approval of transfer agreements.  The advance is contractually documented as an unsecured promissory note that is not part of the transfer agreement.  Shapiro testified that if the state court rejects the transfer agreement and the annuitant does not repay the advance, Novation will not sue or seek arbitration against the annuitant to recover the amount advanced.  If the annuitant enters a transfer agreement with another factoring company, however, Novation will ask the company for the return of the advance out of the lump sum to be paid the annuitant.  (Docket Entry No. 238 at 113–19).  Shapiro testified that if the request is denied, Novation does not pursue further action against either the other factoring company or the annuitant.  (Docket Entry No. 235 at 75–88).  Feldman confirmed in later testimony that Rapid Settlements has accommodated Novation's requests for repayment of advances on several

15

occasions.  (Docket Entry No. 237 at 32–33; Rapid Binder, Ex. 215).[6]  No evidence was presented to support the argument Rapid Settlements advanced.

### C. The Evidence as to the Use of Rights of First Refusal and Security Interests.

### 1. NASP's Evidence

The record shows that Rapid Settlements enters into proposed transfer agreements with annuitants for a portion of the future-payment stream.  In those agreements, Rapid Settlements asserts a right of first refusal in the remaining future payments, which are not covered by the transfer.  The transfer agreements also include a ten percent penalty if the annuitant does not honor this right of first refusal.  The Rapid Settlements right of first refusal clause states:

> In consideration of the Transfer Agreement's execution, Assignor hereby grants and conveys to Rapid Settlements a ten (10) day right of first refusal beginning upon Rapid Settlements' receiving actual written notification of an offer to purchase or otherwise acquire any Periodic Payments, as follows: If Assignor receives an oral or a written offer to sell, assign, borrow against, pledge or otherwise encumber any Periodic Payments and Assignor desires to enter into a transaction involving the sale, assignment, borrowing against, pledging, or other encumbrance thereof, Assignor agrees to immediately notify Rapid Settlements in writing:  (a) that Assignor has received an offer; and (b) describing in detail all terms of said offer along with providing all writings evidencing such.  Assignor agrees to direct any other purchaser to directly pay over to Rapid Settlements ten percent of the amount of Periodic Payments transferred by Assignor to a person in violation or breach of this para[graph].

---

[6]  Rapid Settlements also introduced one example of J.G. Wentworth enforcing repayment of an advance from a pre-SSPA agreement. J.G. Wentworth intervened in a February 2005 transfer confirmation proceeding in Minnesota state court between Rapid Settlements and annuitant Stephanie Lang to assert its interest in approximately $1,400 allegedly due to J.G. Wentworth as the result of Lang's breach of a September 8, 1999 transfer agreement.  (NASP Binder, Ex. 237 at 101–03).  The court order approving the transfer between Rapid Settlements and Lang reflects that Lang ultimately agreed that $1,432.52 would be deducted from her lump sum payment in satisfaction of J.G. Wentworth's claim.  (*Id.*, Ex. 228 at 4 n.2).

(Docket Entry No. 228, Ex. A ¶ 10).

The Rapid Settlements transfer agreements also claim a security interest in the entirety of the annuitant's future-payment rights.  The agreements provide that this security interest, along with the right of first refusal, persists even if the contemplated transfer is not consummated:

> To secure the prompt and complete payment, performance and observance of all of the obligations of Assignor under this Transfer Agreement and regardless of whether such transfer and assignment is consummated and in furtherance of the right of first refusal set forth in para. 10 below, Assignor hereby grants, assigns, conveys, mortgages, pledges, hypothecates and transfers to Rapid Settlements, a security interest (lien) upon all of Assignor's right, title and interest in, to and under all the Assigned Payments (hereinafter the "Collateral"), to secure payment of the Assigned Payments to Rapid Settlements and Assignor's other obligations hereunder. Additionally, Assignor hereby irrevocably authorizes Rapid Settlements at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto covering payments due from the Annuity Issuer to secure Rapid Settlement's rights hereunder and containing any other information required by Article 9 of the Uniform Commercial Code for the filing office's acceptance of any financing statement or amendment.  This Agreement shall function as a security agreement.  Rapid Settlements is authorized to direct Annuity Issuer and/or Settlement Obligor to forward any and all of the Assigned Payments directly to Rapid Settlements in furtherance of this agreement.

(*Id.*, Ex. A ¶ 7).

Rapid Settlements perfects the rights of first refusal and security interests that it obtains by filing UCC financing statements.  These filings state, in relevant part:

> Debtor's ability to sell, transfer, or otherwise hypothecate benefits due under the aforementioned annuity contract are subject to certain rights conveyed to Secured Party under the Transfer Agreement . . . , as it may be amended from time to time, including but not limited to a right of first refusal to purchase any benefits proposed to be sold and a right to a commission if benefits under the aforementioned annuity are sold hereinafter in whole or in part to someone other than

> Secured Party.  In addition, Debtor has sold certain benefits due
> under the aforementioned annuity contract to Secured Party or its
> assigns.

(NASP Binder, Ex. 6).

The record shows that Rapid Settlements takes action to enforce its rights of first refusal and its security interests, even for transfer agreements that are not approved by a state court under the SSPAs, when the annuitants with whom Rapid Settlements has entered these agreements attempt to enter into transfer agreements with other factoring companies.  Typically, Rapid Settlements learns that an annuitant is about to enter a transaction with another factoring company when that company discovers the Rapid Settlements UCC filing and contacts Rapid Settlements to determine whether it in fact has an interest in the payments the factoring company intends to purchase.  (*See, e.g.,* NASP Binder, Ex. 6).  Rapid Settlements then threatens the factoring company or the annuitant with legal action or arbitration if the asserted right of first refusal or security interest is not honored.  (*See, e.g.,* Docket Entry No. 206, Ex. A-5).  This sometimes convinces the other factoring company to walk away from the transaction, or convinces the annuitant to cancel the contract with the other factoring company and enter a transfer agreement with Rapid Settlements.  Rapid Settlements sometimes invokes arbitration against the annuitant for "breach" of the transfer agreement, seeking as damages for the alleged "breach" a transfer of the annuitant's structured settlement payment rights as contemplated under the original proposed transfer agreement with Rapid Settlements, even if it was not approved by a court.  Or Rapid Settlements will seek to stay the SSPA state-court approval proceeding between the annuitant and the other factoring company.  Rapid Settlements may also intervene in the court approval proceeding between the annuitant and the other factoring company to assert its purported right of first refusal or security interest.  (*See, e.g., id.*, Ex. A-8).

NASP submitted evidence in the form of documents and testimony relating to several annuitants who entered into proposed transfer agreements with Rapid Settlements and against whom Rapid Settlements invoked rights of first refusal or security interests. The case law provides several other examples. The facts set out in the record and the case law as to each of the several annuitants are described below.

### a.    Kenneth Gross

Kenneth Gross holds a Symetra-issued annuity under which he has received or will receive 480 monthly payments of $3,000 per month beginning on October 1, 1996; a lump sum payment of $150,000 payable on September 1, 2006; and a lump sum payment of $250,000 payable on September 1, 2011. In August 2004, Rapid Settlements sought approval in Indiana state court of a proposed partial transfer agreement with Gross. The transfer agreement granted Rapid Settlements a "ten (10) day right of first refusal beginning upon Rapid Settlements' receiving actual written notification of an offer to purchase or otherwise acquire any Periodic Payments," and provided that Rapid Settlements would be entitled to a penalty of "ten percent of the amount of Periodic Payments transferred by assignor to a person in violation or breach" of the right of first refusal. (NASP Binder, Ex. 4 ¶ 10). The transfer agreement also stated that Rapid Settlements had a security interest in the entirety of Gross's payment rights, which would be effective "regardless of whether such transfer and assignment [wa]s consummated and in furtherance of the right of first refusal." (*Id.*, Ex. 4 ¶ 7).    Rapid Settlements filed a UCC financing statement that claimed a security interest in all of Gross's annuity, along with the right of first refusal and ten percent penalty. The UCC filing identified the secured interest as:

> General intangibles of the Debtor including but not limited to those held by the Debtor under that certain annuity contract No.

19

> AA075G510 (Safeco Assigned Benefits Service Company and/or
> Safeco Life Insurance Company) providing benefits thereunder to
> Kenneth Ray Gross.  Debtor's ability to sell, transfer, or otherwise
> hypothecate benefits due under the aforementioned annuity contract
> are subject to certain rights conveyed to Secured Party under the
> Transfer Agreement originally dated May 28, 2004, as it may be
> amended from time to time, including but not limited to a right of
> first refusal to purchase any benefits proposed to be sold and a right
> to a commission if benefits under the aforementioned annuity are sold
> hereinafter in whole or in part to someone other than Secured Party.
> In addition, Debtor has sold certain benefits due under the
> aforementioned annuity contract to Secured Party or its assigns.

(*Id.*, Ex. 6).  The Indiana state court denied approval of the transfer under the SSPA on December

20, 2004.  (*Id.*, Ex. 5).  Rapid Settlements did not remove the UCC financing statement from the

public records after the denial.

Shortly after the state court's denial of the transfer, Gross approached 321 Henderson LLC,

a NASP member, about a partial transfer.  On January 6, 2005, 321 Henderson sent Rapid

Settlements a letter inquiring about the UCC filing relating to Gross and asking that "[i]f there [wa]s

any duplication to what 321 Henderson [wa]s purchasing," Rapid Settlements contact 321

Henderson with "specifics of [its] purported interest along with all supporting documentation." (*Id.*,

Ex. 6).  321 Henderson's David Reape testified that Rapid Settlements did not provide supporting

documentation to 321 Henderson but did contact Gross to threaten legal action.  Gross responded

to the warning by exercising his right to terminate his transfer agreement with 321 Henderson.

(Docket Entry No. 235 at 137).[7]  Rapid Settlements then entered into another transfer agreement

with Gross on February 9, 2005.  Like the earlier Rapid Settlements transfer agreement, this new

agreement contained provisions for a right of first refusal, the ten percent penalty, and the security

---

[7] Reape's affidavit submitted in support of preliminary and permanent injunction states that 321 Henderson
cancelled the contract with Gross.  (Docket Entry No. 206, Ex. D ¶ 8).

interest in the entire annuity.  (NASP Binder, Ex. 8 ¶¶ 7, 10).[8]  Reape testified that 321 Henderson was harmed because the Rapid Settlements threat to seek legal enforcement of its purported right of first refusal prevented 321 Henderson from completing its transaction with Gross.  (Docket Entry No. 235 at 134–144).

### b.    Keith Thurston

Keith Thurston holds an annuity issued by Hartford Life Insurance Company for 132 monthly payments of $1,200 between February 1, 2001 and January 1, 2012; a lump sum payment of $25,000 payable on November 1, 2006; and a lump sum payment of $35,000 payable on November 1, 2011.  Around May 2006, Thurston completed an agreement to transfer a portion of his future-payment stream to Rapid Settlements.  On May 31, 2006, Rapid Settlements filed a UCC financing statement that claimed a security interest in the entirety of Thurston's annuity, along with a right of first refusal and a "commission" if Thurston sold the remainder of the annuity to someone else.  (Docket Entry No. 206, Ex. A-2). There is no evidence that Thurston's transfer agreement with Rapid Settlements was approved by a court, as required by the applicable SSPA.  On September 19, 2006, Thurston sent a letter to Rapid Settlements stating that he was "exercising [his] rights pursuant to Item #6 as per The Disclosure Notice Required by Law, to cancel any and all agreements, signed by me to Rapid Settlements."  The letter asked Rapid Settlements to "cancel this Transfer effective immediately due to non-performance of the Contract to date."  (*Id.*, Ex. A-6).

---

[8]  Rapid Settlements later invoked these and two subsequent transfer agreements with Gross in arbitration proceedings to effect a transfer of Gross's future-payments rights.  This court addressed these arbitration proceedings in its January 10, 2007 and March 31, 2008 orders, concluding that they violated the applicable SSPA.  (Docket Entry No. 84 at 17–25; No. 240 at 52–62).

Around October 2006, Thurston signed an agreement with First Providen to transfer certain

of his future-payment rights.  On October 4, 2006, First Providen gave Rapid Settlements notice that

it had filed a proceeding in Illinois state court for approval of the transfer agreement.  (*Id.*, Ex. A-3).

Rapid Settlements responded on October 6, 2006 by sending Thurston a letter threatening to enforce

its right of first refusal.  The letter stated:

> On June 21, 2006, you entered into an agreement with Rapid
> Settlements, Ltd. ("Rapid") in which you granted to Rapid a ten (10)
> business day right of first refusal on subsequent Transfers.  The ten
> (10) day period begins once you notify Rapid of another offer that
> you desire to undertake for the sale of structured settlement payment
> rights.  On October 5, 2006 we learned that you entered into an
> agreement with First Providen, L.L.C. to sell certain structured
> settlement payment rights to First Providen.
>
> Based upon the terms of the offer from First Providen, Rapid will and
> hereby does match the offer by First Providen in the above referenced
> matter.  Please contact Rapid so that we can effectuate same and
> complete your transfer with a minimum delay and without additional
> cost to you.
>
> Please note that in the event we cannot resolve this matter amicably,
> which is our strong preference, the documents that you executed
> allow for expedited relief through arbitration.  We prefer to resolve
> this matter amiable [sic] and expeditiously.

(*Id.*, Ex. A-5).

On October 31, 2006, Rapid Settlements obtained an arbitration award from a Texas

arbitrator enjoining Thurston from proceeding with the transfer with First Providen.  (*Id.*, Ex. A-7).

Rapid Settlements then intervened in the Illinois state-court approval proceeding between Thurston

and First Providen.  Despite the fact that the judge had already approved the transfer agreement,

Rapid Settlements convinced the judge to stay the transfer to consider the argument that its

arbitration award deprived the Illinois court of jurisdiction and precluded the transfer.  (*Id.*, Ex. A-8).

22

The Illinois court rejected the arguments made by Rapid Settlements and lifted the stay of the transfer on November 17, 2006.  (*Id.*).  First Providen's Hall testified that Rapid Settlements delayed the transfer and cost First Providen about $9,300 in attorneys' fees, much more than the $2,000–$2,500 First Providen typically spends  seeking court approval under the SSPAs.  (Docket Entry No. 235 at 223–224).

### c.    Simmie King

An opinion from the Texas Court of Appeals provides another example of how Rapid Settlements uses rights of first refusal.  *See In re Rapid Settlements, Ltd.*, No. 14-06-00698, 2007 WL 925698 (Tex. App.–Houston [14th Dist.] Mar. 29, 2007, mandamus denied).  Simmie B. King has an annuity under which he is entitled to receive 83 monthly payments of $532.50 between September 1, 2009 and July 1, 2016.  On January 5, 2005, Rapid Settlements and King signed an agreement under which Rapid Settlements would acquire all of King's future-payment rights.  The agreement contained a right of first refusal clause and provided for a ten percent penalty if the right of first refusal was not honored.  On May 23, 2005, a Georgia state court denied the transfer under the SSPA because it was not in King's best interest.  *Id.* at *1.

King subsequently entered another transfer agreement with Peachtree.  This agreement was approved by a Georgia court under that state's SSPA on January 12, 2006.  When Rapid Settlements received notice of this approval, it asserted its right of first refusal over King's annuity payments.  On January 25, 2006, Rapid Settlements initiated arbitration against King and Peachtree in Texas.  In the arbitration, Rapid Settlements sought to void King's proposed—and approved—transfer agreement with Peachtree and to effectuate the transfer of structured settlement payment rights contemplated under the proposed—and rejected—transfer agreement between Rapid Settlements

and King.  Peachtree and King sought and obtained a temporary retraining order in Texas state court to stay the arbitration.  The state court ultimately denied a motion by Rapid Settlements seeking to compel the arbitration.  *Id.* at *2.  Rapid Settlements unsuccessfully sought a writ of mandamus in the Texas Court of Appeals.  *Id.*  Peachtree bore the costs of the Rapid Settlements litigation.

### d.    Tousha Fowler

NASP President Shapiro recounted a 2006 incident in which his company, Novation, sought court approval under the SSPA of a transfer agreement for structured settlement payments belonging to an annuitant named Tousha Fowler in North Carolina.  According to Shapiro, a lawyer for Rapid Settlements appeared in court to challenge the transfer.  The lawyer stated that Rapid Settlements had obtained the transfer of a part of Fowler's future-payment stream in Tennessee, with the approval of a state court.  This transfer agreement contained a right of first refusal for Rapid Settlements to purchase all of Fowler's remaining payments.  No state court had reviewed or approved the proposed transfer of the remainder of the payments to Rapid Settlements, although Shapiro did not know if the Tennessee court that approved the initial transfer to Rapid Settlements also approved the right of first refusal provision.  Nonetheless, the Rapid Settlements lawyer stated that he had already initiated arbitration proceedings in Texas against Fowler to enforce the right of first refusal and prevent him from transferring the rest of the payments to Novation.  Shapiro testified that Novation "stepped away" from the deal because "it was simply not worth proceeding with the transaction," which would have involved multiple-district litigation.  (Docket Entry No. 235 at 52–56).

NASP argues that the practice of enforcing rights of first refusal or security interests in transfer agreements not approved by a state court impermissibly circumvents the SSPA

requirements.  NASP argues that this practice clouds title to annuitants' structured settlement payment rights, raising the transaction costs for NASP members seeking to contract with annuitants who have previously entered proposed transfer agreements with Rapid Settlements, which in turn discourages NASP members from doing so.  NASP argues that its members, which do not engage in such means of circumventing SSPA approvals, are placed at a competitive disadvantage by the use of this practice by Rapid Settlements.  NASP also fears that enforcing rights of first refusal or security interests in transfer agreements that were not approved by a state court is likely to prompt state and federal legislators to seek more restrictive legislation, which will harm the ability of factoring companies to continue in business.

## 2.    The Defenses Asserted by Rapid Settlements

Rapid Settlements responds that its practices with respect to rights of first refusal and security interests do not violate the SSPAs because these statutes do not apply to transfers of such rights and interests.  Rapid Settlements also advances an unclean-hands defense, arguing that NASP members engage in many of the same practices and that the present suit is driven by anticompetitive motive.  Feldman testified that the right of first refusal and security interest provisions of which NASP complains are provisions that Rapid Settlements "extracted . . . from contracts of competitors," including NASP members, when drawing up its form documents after going into business in 2003.  (Docket Entry No. 235 at 20).

### a.    Rights of First Refusal and Security Interests in NASP Transfer Agreements

At the injunction hearing, Rapid Settlements offered into evidence transfer agreements drafted by NASP members containing language about rights of first refusal and security interests similar to language found in Rapid Settlements's transfer agreements.  One such example appears

25

in a post-SSPA transfer agreement between NASP member SSC Settlements, LLC ("Stone Street")

and annuitant Tiffany Henderson, signed on September 15, 2005.  (Rapid Binder, Ex. 197).  Under

the transfer agreement, "Periodic Payments" were those purchased by Stone Street under the transfer

agreement, and "Settlement Payments" were those "not sold to [Stone Street] pursuant to this

Agreement and remaining to be paid after the date after the date of this Agreement."  (*Id.*, Ex. 197,

recital B).[9]  The transfer agreement contained a right of first refusal clause that purported to remain

effective even if the underlying transfer agreement were cancelled:

> Seller agrees that during the Term, Seller will not sell, assign, borrow
> against, pledge, or otherwise encumber any one or more of the
> Settlement Payments not included in the Periodic Payments assigned
> to Purchaser without giving Purchaser written notice of the terms of
> any such proposed loan or sale . . . .  If, within ten business days of
> receiving such notice, Purchaser informs Seller that it elects to match
> the terms of any such proposed loan or sale, then Seller shall execute
> all documents necessary to consummate such transaction with
> Purchaser on those terms.  The foregoing right of first refusal shall
> survive the exercise of any right of cancellation or rescission that
> Seller or Purchaser may have under this Agreement, or applicable
> law.

(*Id.*, Ex. 197 ¶ 11.15).  The transfer agreement also asserted a security interest in all of Henderson's

payment rights under the annuity:

> As may be required by law to effectuate a transfer of the Periodic
> Payment Rights, and as security for the performance of all of the
> Seller's obligations under this Agreement, Seller hereby irrevocably
> and unconditionally assigns, pledges and grants to Purchaser a
> continuing security interest in the Periodic Payment Rights, the
> Remaining Settlement Payments and the proceeds of the same
> (collectively the "Collateral").  Purchaser's assignment, pledge and

---

[9]  It is not clear which payments were to be purchased under this transfer agreement.  The total annuity
payments to which Henderson was entitled were to be set forth in an "Exhibit A"; the periodic payments to
be purchased by Stone Street were to be set forth in an "Exhibit B."  Neither exhibit was attached to the copy
of the transfer agreement that Rapid Settlements introduced into evidence.

> grant is coupled with an interest and shall continually exist until all
> Periodic Payment Rights have been received, and the Remaining
> Settlement Payments have been paid in full.

(*Id.*, Ex. 197 ¶ 4.3).   Rapid Settlements represented that this transfer agreement was approved by

a state court, but did not attach a copy of the order granting approval.   (Docket Entry No. 236 at

52–53).

A post-SSPA transfer agreement between NASP member R&P Capital Resources Inc. and

annuitant Patrick Davis, signed on June 29, 2006, contains similar provisions.  (Rapid Binder, Ex.

198).  The agreement stated that R&P Capital had a "right of first refusal to purchase or otherwise

obtain any Payments which have not previously been assigned, Transferred, or conveyed." The right

of first refusal would  "survive the exercise of any right of recision that either You or We may have

under the terms of this Agreement." (*Id.*, Ex. 198 ¶ 10).  The transfer agreement also took a security

interest in all of Davis's payment rights under the annuity.  (*Id.*, Ex. 198 ¶ 11).[10]  The record does

not show whether court approval of this transfer agreement was ever sought or obtained.[11]

---

[10]  As with Stone Street's transfer agreement with Henderson, however, it is not clear which payments were
to be purchased under this transfer agreement.  The agreement stated that the total annuity payments to which
Davis was entitled were to be listed in an attached annuity contract, but no such contract was attached to the
transfer agreement that Rapid Settlements submitted into evidence.  The agreement also stated:

> You wish to assign and transfer to US your rights to the total portion of 120
> monthly payments of $1000.00 commencing August 18, 2006 and
> continuing through July 18, 2016 ("Assigned Payments").  Your assignment
> and transfer of the Assigned Payments shall begin with the payment due on
> or about October 18, 2006 and shall continue through and include the
> payment to be made on or about September 18, 2025.

(Rapid Binder, Ex. 198, recitals).

[11]  Rapid Settlements presented another post-SSPA transfer agreement, dated December 20, 2006, between
Settlement Capital and annuitant Terry R. Swenson.  Rapid Settlements contends that this agreement secures
a similarly broad security interest.  This contention appears inaccurate.  The transfer agreement takes a
security interest in "[a]ll of Seller's right, title and interest in any and all money due or to become due, in

A post-SSPA transfer agreement between NASP member First Providen and annuitant Michael Alan Luster, signed June 15, 2007, also contained similar provisions.  (Rapid Binder, Ex. 200).  The agreement was for the purchase of a portion of Luster's future-payment rights.  The agreement contained a clause that claimed a "right of first refusal to purchase or otherwise obtain any Payments which have not previously been assigned, transferred or conveyed" that would "survive the exercise of any right of rescission that either You or We may have under the terms of this Agreement."  (*Id.*, Ex. 200 ¶ 11).  The agreement also took a first priority security interest in "any and all money due or to become due under the Annuity."  (*Id.*, Ex. 200 ¶ 13).  The record does not show whether court approval of this agreement was ever sought or obtained.

A post-SSPA transfer agreement between NASP-member Novation and annuitant Eric G. Deadmon for the purchase of part of Deadmon's future-payment rights also contained similar language.  The agreement, dated August 19, 2002,  claimed a right of first refusal that would be effective for 36 months after the date of the transfer agreement.  This right would "survive the exercise of any right of cancellation or rescission that Seller or Purchaser may have under this Agreement or applicable law."  (Rapid Binder, Ex. 230-A ¶ 4.9).  The agreement also took a first-priority security interest in "all of Seller's right, title and interest in any and all money due or to become due under the Settlement Agreement and/or the Annuity."  (*Id.*, Ex. 230-A ¶ 4.2).  Rapid Settlements also submitted Novation's court petition for approval of the transfer agreement, which

---

relation to the Periodic Payments, and any and all proceeds received in respect to same." (Rapid Binder, Ex. 232 ¶ 4.1).  "Periodic Payments" are defined as "certain Settlement Payments due and payable to Seller" purchased by Settlement Capital, along with "all of Seller's rights, title and interests therein and thereto." (*Id.*,Ex. 232, recitals).  This Settlement Capital agreement does not appear to take a security interest in any payments beyond those that Settlement Capital acquired.

did not mention the right of first refusal or the security interest.  (*Id.*, Ex. 230).[12]  The record does not show whether a court approved the transfer.

Shapiro, the president of Novation, conceded that for a period after the SSPAs were enacted, Novation's transfer agreements included "vestigial" right of first refusal and security interest provisions carried over from pre-SSPA agreements.  According to Shapiro, these provisions were removed from Novation's transfer agreements around 2005.  Shapiro pointed to a subsequent transfer agreement with annuitant Deadmon, dated February 18, 2005, which gave Novation a security interest only in the assigned payments and only "subject to the court's approval of the sale." (Rapid Binder, Ex. 246 ¶ 13; Docket Entry Nos. 236 at 33, 238 at 60–61).  The agreement also provided that if "the court does not approve the sale . . . no payments will be transferred from you, no monies will be paid to you, you will have no further obligation to Novation, and Novation will have no further obligation to you."  (Rapid Binder, Ex. 246 ¶ 19).  Gary Hall of First Providen similarly testified that it had also included "vestigial" rights of first refusal in post-SSPA transfer agreements.  These provisions were removed, but appeared as recently as 2007.  However, First Providen did not enforce those provisions after the SSPAs were enacted.  (Docket Entry No. 235 at 222–25; Rapid Binder, Ex. 200).

Rapid Settlements also introduced into evidence other NASP-member transfer agreements containing security interests that are more limited than those found in the Rapid Settlements agreements but that do apply to payments beyond those purchased.  One such agreement is a post-SSPA transfer agreement between Peachtree and annuitant Sharita Banks, dated January 2, 2004.

---

[12]   The transfer agreement and court petition were drafted by Feldman, who later became the Rapid Settlements president, CEO, and lawyer, and who at the time was Novation's attorney.

(Rapid Binder, Ex. 231).  The transfer agreement purported to take a security interest, "to the extent permitted by law," in all of Banks's annuity payments, although under the transfer agreement, Peachtree purchased only some of those payments.  The clause stated:

> Under this Agreement and only to the extent permitted by law Assignee and I intend to create a security interest under Article 9 of the Uniform Commercial Code . . . in my rights to an interest in payments due to me under the Settlement Agreement, which rights have been assigned to Assignee as General Intangibles under Article 9 of the Uniform Commercial Code . . . .

(*Id.*, Ex. 231 ¶ E).  Rapid Settlements introduced a similar Peachtree transfer agreement with annuitant Simmie King, dated September 22, 2005.  (Rapid Binder, Ex. 191).  The record does not show whether a court approved these transfer agreements.

Another transfer agreement between Stone Street and annuitant Brian Napier dated October 13, 2008 contained a provision that would require Napier to subordinate his rights to the remaining payments to Stone Street's right to be made whole if Napier's full future-payment rights were reduced by the annuity company.  (Rapid Binder, Ex. 241 ¶ 11.15).  The agreement asserted a security interest in the remaining payments "as a security for the performance of all of the Seller's obligations under this Agreement."  (*Id.* ¶ 4.4).  Counsel for Rapid Settlements acknowledged that the transfer had been approved by court order but did not introduce this order into the record.  (Docket Entry No. 236 at 74).  Similarly, a Stone Street transfer agreement signed with annuitant Rosa A. Contreras on May 21, 2007, asserted a security interest only in the assigned payments, but provided that if Contreras's structured settlement payments were reduced, "the reduction [would] first [be] taken from any payments that we did not purchase."  (Rapid Binder, Ex. 195 ¶ 14).  The record does not indicate whether a court approved this transfer.

### b.    Enforcement of Rights of First Refusal and Security Interests

30

NASP argues that the language used in its members' transfer agreements—much of which is a "vestige" from pre-SSPA days—is far less important than efforts to enforce rights of first refusal and security interests.  According to NASP, the SSPAs prohibit the enforcement of such provisions to effectuate transfers not approved by a state court under the applicable SSPA.  Rapid Settlements counters that NASP members have, in fact, attempted to enforce the rights and interests asserted by such language, without court approval.  Rapid Settlements contends that, for example, NASP members have filed UCC financing statements that claim a right of first refusal and security interest in annuitants' entire future-payment stream, rather than simply the payments purchased, an action that clouds title to annuitants' future-payment rights.  Rapid Settlements submitted as evidence a UCC financing statement filed by Stone Street connection with a March 6, 2004 transfer agreement with annuitant Sherneice N. Brown.  The UCC filing identified Brown's entire payment rights as collateral and stated:

> The Debtor has entered into a contract with the Secured Party pursuant to which the Debtor has given the Secured Party an irrevocable right of first refusal option to purchase and/or lend against the collateral set forth herein.  In addition to securing other contract rights, the Debtor has given the Secured Party a security interest in the collateral set forth herein to secure the Debtor's obligations under the right of first refusal option.  This Financing Statement is also being filed for the purpose of evidencing the Secured Party's security interest in the above referenced collateral pursuant to the right of first refusal option.

(Rapid Binder, Ex. 242).  Stone Street filed a UCC financing statement with similar language in connection with its February 21, 2004 transfer agreement with annuitant John Bracewell.  (*Id.*).  The

record does not show whether the transfer agreements associated with these UCC filings were approved by a state court under the applicable SSPA.[13]

Rapid Settlements also contends that NASP members have attempted to enforce broad security interests not approved by a court under the applicable SSPA against Rapid Settlements. Rapid Settlements submitted a June 15, 2005 letter it received from NASP-member Settlement Capital.  The letter is in response to a June 6, 2005 letter inquiry from Rapid Settlements, not included in the record, in which Rapid Settlements informed Settlement Capital that it intended to buy a portion of annuitant Michael D. Chisom's future-payment stream.  Settlement Capital attached a December 19, 2003 Illinois state court order approving the transfer of part of Chisom's annuity payments to Settlement Capital.  (Rapid Binder, Ex. 205).  The court order did not mention a security interest.  The letter stated:

> SCC owns $610.00 of each $1,220.00 monthly payment commencing November 20, 2003 and continuing through August 30, 2012; $610.00 of each $1,500.00 monthly payment due and payable September 30, 2012; and $11,500.00 of each $12,500.00 annual payment commencing September 30, 2004 continuing through September 30, 2006 under the structured settlement in question. Moreover, SCC has a security interest in all payments due under the structured settlement.  Attached hereto is a copy of Exhibit "A" to the Purchase Agreement showing the transfer by Mr. Chisom, and the court order we obtained.
>
> Further, a court order directs that all payments due under this structured settlement and annuity are to be sent to and serviced by SCC.

---

[13]  It is not clear from the language in these filings that the underlying transfer agreements were only for a portion of the annuitants' payment rights, although the assertion of a right of first refusal in these filings suggests that the transfers were, in fact, partial.

(*Id.*).  Rapid Settlements introduced similar letters from Settlement Capital relating to post-SSPA partial transfer agreements with annuitants Gaylord LaTray and Meatia Goodman.  The court orders approving these transfers did not refer to the security interest that Settlement Capital claimed. (Rapid Binder, Exs. 184, 207).  None of these letters from Settlement Capital threatened legal action, but Feldman testified that, as the CEO of Rapid Settlements, he understood these letters to indicate that "there may be a fight at some point in time" if Rapid Settlements went forward with the transfers.  (Docket Entry No. 237 at 59).

First Providen's Gary Hall testified that First Providen does not enforce rights of first refusal in post-SSPA transfer agreements, even though some of these transfer agreements state that the right of first refusal remains effective even if the transfer is not consummated.  Hall admitted, however, that First Providen does not tell customers that the rights of first refusal will not be enforced unless the customers specifically ask.  Nor does First Providen threaten enforcement.  Instead, First Providen salespeople are instructed to tell the customers simply that First Providen "would like [them] to come back to [First Providen]" if they want to do another deal.  (Docket Entry No. 235 at 230).

Rapid Settlements also introduced into evidence examples of NASP members taking legal action to enforce rights of first refusal and security interests in transfer agreements entered before the SSPAs were enacted, although the parties vigorously dispute whether enforcement of pre-SSPA agreements is relevant to the unclean hands issue.  Rapid Settlements introduced into evidence a March 7, 2005 letter from J.G. Wentworth to Rapid Settlements that threatened legal action to enforce a pre-SSPA security interest in all of annuitant Walter Bridges's annuity payments.  The security interest was acquired in two transfer agreements dated August 14, 1997 and August 11,

1999.  (Rapid Binder, Ex. 239).  The March 7, 2005 J.G. Wentworth letter stated that "[w]e intend

to litigate our rights under our contract with Mr. Bridges and will seek from him any damages we

incur as a result of his breach of our contract."   (*Id.*).   The letter also stated that "we regard these

actions of Rapid Settlement [sic], Ltd., as a tortious interference with our contract with Mr. Bridges,

and will bring legal action, if necessary, against them to enforce our rights."  (*Id.*).  J.G. Wentworth

sent a similar letter to Rapid Settlements with respect to annuitant Donzel Adams.  (Rapid Binder,

Ex. 240).  David Reape admitted that J.G. Wentworth's subsidiary, 321 Henderson, had sent letters

threatening legal enforcement of rights of first refusal in pre-SSPA contracts, although no action was

in fact taken.  (Docket Entry No. 235 at 155–162).

Rapid Settlements also introduced evidence of a lawsuit filed against it by Settlement Capital

in April 2007 to enforce a pre-SSPA security interest that Settlement Capital had acquired in a

portion of annuitant Delbert Rogers's future-payment rights.   (Docket Entry No. 237 at 20–22;

Rapid Binder, Ex. 244).  Feldman testified that the parties recently agreed to settle this dispute, with

both sides simply walking away.  (Docket Entry No. 237 at 22).  Settlement Capital also attempted

to intervene in a 2005 court proceeding to approve a proposed agreement between Rapid Settlements

and annuitant Lanu T. Naufahu under the SSPA.   Settlement Capital "appeared and filed pleadings,"

alleging an interest in the annuity payments Rapid Settlements was acquiring.  The interest arose

from a  2003 court order that awarded Settlement Capital lump-sum damages for Naufahu's alleged

breach of a pre-SSPA transfer agreement.  (Docket Entry No. 237 at 27).  Settlement Capital's

efforts to stop the transfer between Rapid Settlements and Naufahu were unsuccessful and the court

approved the transfer.  Settlement Capital then sued Rapid Settlements to garnish the money to

which it contended it was entitled.  (Rapid Binder, Ex. 243).  The record does not reveal the outcome of that litigation.  (Docket Entry No. 237 at 26).

Based on this record, this court finds and concludes that NASP has standing to pursue this action; that NASP has met the requirements for the permanent injunction it seeks; and that Rapid Settlements has not established an unclean-hands defense that would preclude injunctive relief.

## III.    NASP has Standing to Pursue this Action

Rapid Settlements asserts as a threshold matter that NASP lacks standing to sue for injunctive relief because it is not "personally aggrieved" by the challenged actions and is not a party to any of the transfer agreements of which it complains.  NASP counters that it has standing to assert claims on behalf of its members, who have been harmed and placed at a competitive disadvantage by the practices Rapid Settlements follows that effect transfers without complying with the SSPAs.  NASP also claims standing to seek injunctive relief in its own right because Rapid Settlements has caused injury-in-fact to NASP's "purposes and activities" by threatening the viability of the legislation that NASP worked to put into place.

### A.    Associational Standing

An association has standing to bring suit on behalf of its members if: (1) at least one of the members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members.  *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).   Article III standing requires a showing of: (1) an injury-in-fact; (2) that is traceable to the defendant's challenged conduct; and (3) that is likely to be redressed

by a favorable decision in the district court.  *Id.* at 586 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (5th Cir. 2004)).

NASP has shown that its members have experienced injury-in-fact.  The Rapid Settlements practices of using arbitration awards and of enforcing rights of first refusal and security interests to effectuate transfers of future payment rights not approved by a court under the SSPAs cloud title to annuitants' payment rights, raising the transaction costs for NASP members that seek to enter transfer agreements with those annuitants.  For example, NASP-member Peachtree incurred extensive legal fees in the Lucille Harrod matter when Rapid Settlements intervened in approval proceedings to assert a right to Harrod's future-payment stream that Rapid Settlements purported to have acquired through arbitration. Similarly, in the Keith Thurston matter, Rapid Settlements intervened in Illinois state court approval proceedings to assert a right of first refusal, costing First Providen significant additional attorneys' fees.  Rapid Settlements asserted a right of first refusal in the Simmie King matter, necessitating protracted litigation by Peachtree.

NASP has also shown that the prospect of increased transaction costs has caused NASP members to avoid transfers with annuitants who have already entered proposed transfer agreements with Rapid Settlements.  Shapiro testified that Novation abandoned a proposed transaction with Bankston after learning that Rapid Settlements was asserting an arbitration award against her.  The challenged practices Rapid Settlements uses have also dissuaded annuitants from going forward with transactions with other factoring companies, as in the case of Kenneth Gross, who abandoned a proposed transfer agreement with 321 Henderson after receiving a letter from Rapid Settlements threatening legal enforcement of a right of first refusal.  The loss of such proposed transfers injures NASP members.  And by improperly using arbitration, rights of first refusal, and security interests

36

to obtain annuity payments without SSPA-required court approval, Rapid Settlements places NASP members, who must follow the SSPAs, at a competitive disadvantage. The injury-in-fact requirement for standing is satisfied.

Causation and redressability are also satisfied. The NASP members' injuries are caused by the practices Rapid Settlements uses. Future injuries would be remedied by an injunction imposed by this court. The interests that NASP seeks to protect are germane to its purposes, which are to "educate the public about structured settlements; promote and support the secondary market in structured settlements; encourage sound, fair and appropriate business practices in the secondary market; and support industry efforts in the court and in the legislative arena." (Docket Entry No. 239 at 7). The injunctive relief sought does not require the participation of NASP's individual members. NASP has standing on behalf of its members to pursue this injunctive relief.

### B.      Direct Standing

Because NASP has standing to sue on behalf of its members, it need not establish direct standing. Nevertheless, NASP has also asserted facts that establish its standing to sue in its own right. "[A]n organization can assert standing to protect against injury to its own organizational interests." 13A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3531.9.5, at 851 (3d ed. 2008). NASP asserts and presented evidence that by  subverting the SSPA—by effecting transfers through arbitration and interfering with legitimate transfers by asserting rights of first refusal and security interests as to future payments that were not approved for transfer by a state court under the applicable SSPA—Rapid Settlements has injured NASP's ability to promote fair business practices under the SSPAs and to promote the secondary market in the structured settlement industry. (Docket Entry No. 239 at 7). Shapiro testified that NASP expended considerable

37

resources in supporting the present federal and state statutory scheme, which preserves the factoring industry's ability to continue to do business while satisfying legislative concerns about the rights and interests of annuitants.  (Docket Entry No. 235 at 28–40).  NASP argues that the actions by Rapid Settlements threaten the legislative balance by "creating the risk that state legislatures or the federal Congress will enact stricter structured settlement protection laws," which in turn could "increase[ ] the time and cost required for a transfer" or "prohibit[ ] the secondary market altogether."  (Docket Entry No. 239 at 9 n.12).  NASP contends that it "has had to divert its attention and resources away from its other activities in support of the secondary market so it can repair damage done to this industry by Defendant's conduct and challenge Defendant's unlawful conduct at issue in this lawsuit."  (*Id.* at 9).[14]

NASP's arguments are similar to those found sufficient for standing in *Texas Democratic Party v. Benkiser*, 459 F.3d at 586.  In *Benkiser*, the Fifth Circuit concluded that the Texas Democratic Party had standing to seek an injunction preventing the Texas Republican Party from changing their candidate on the ballot shortly before the general election, when the change would violate the Qualifications Clause of the United States Constitution.  The court concluded that the Texas Democratic Party had demonstrated injury-in-fact for standing purposes because it had expended significant funds preparing for a race against the candidate listed on the ballot.  If a change in candidate were to occur, the Texas Democratic Party "would need to raise and expend additional funds and resources to prepare a new and different campaign in a short time frame."  *Id.* at 586.

---

[14]   NASP also contends that Rapid Settlements has harmed its mission by "injecting uncertainty into the proposed transactions" and "creat[ing] uncertainty regarding the legal title to structured settlement payment rights, thereby creating a disincentive for other NASP members to offer their services to annuitants who have previously done business with Defendant."  (Docket Entry No. 239 at 8–9).  These arguments support NASP's standing on behalf of its members rather than direct standing in its own right.

NASP alleges and has presented evidence of direct injury-in-fact.  The actions and practices by Rapid Settlements threaten the legislative balance that NASP has expended significant resources to help put into place and implement.  Like the Republican Party in *Benkiser*, the actions by Rapid Settlements will cost NASP significant additional resources.  Causation and redressability are also present.  The injury that NASP alleges arises directly from the actions and practices by Rapid Settlements and would be remedied by an injunction prohibiting Rapid Settlements from engaging in that conduct.  NASP has standing to pursue this injunctive relief.

**IV.     NASP's Application for a Permanent Injunction**

To obtain a permanent injunction, a party must demonstrate that (1) it has achieved actual success on the merits; (2) it has sustained irreparable injury or there is no adequate remedy at law; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the injunction will not disserve the public interest.  *See ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

**A.     Findings and Conclusions on Enjoining Rapid Settlements from Using Arbitration to Effectuate Transfers without the Approval Required By the SSPAs**

**1.     NASP Has Demonstrated Success on the Merits and Irreparable Injury**

**a.     Rapid Settlements is Improperly Using Arbitration to Circumvent the State SSPAs**

This court has already held that the arbitration proceedings and awards that Rapid Settlements pursues, as well as the judgments confirming such awards, are improper because they circumvent and undermine the SSPAs.  (Docket Entry No. 240 at 38–49).  This court also rejected the argument by Rapid Settlements that obtaining confirmation of an arbitration award in state court

39

equates to the court approval of the proposed transfer that the SSPAs require, because a court's inquiry in confirming an arbitration award is necessarily limited.  (*Id.*).  The Fifth Circuit affirmed.

The present issue is whether the relief granted to Symetra—which enjoined Rapid Settlements from using arbitration to obtain, directly or indirectly, a transfer of all or part of the future annuity payments of Symetra annuitants without court approval under the SSPAs—should be extended to enjoin Rapid Settlements from using arbitration to effect a transfer of all or part of the future-payment rights of other annuitants as well.  The record and the case law clearly support this relief.  The way Rapid Settlements uses arbitration violates the SSPAs.  In affirming this court's grant of injunctive relief to Symetra, the Fifth Circuit stated that "a sham arbitration cannot be used as a device to bring about an otherwise unlawful transfer.  To hold otherwise would be to sanction easy invalidation of a wide range of state policies."  *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, --- F.3d ---, 2009 WL 1277736, at *1 (5th Cir. May 11, 2009).  The Fifth Circuit reached a similar conclusion in *Allstate Life Ins. Co. v. Rapid Settlements Ltd.*, No. 08-60685, 2009 WL 1175534, at *1 (5th Cir. May 1, 2009) (unpublished), in which it affirmed a grant of injunctive relief in favor of a different annuity issuer, Allstate Life Insurance Company.  The court rejected the argument by Rapid Settlements that court approval under the Mississippi SSPA was not required because the act "applies only in narrow situations and does not apply to arbitration proceedings rooted in breach of contract claims."  *Id.*  The Fifth Circuit stated:  "We are unpersuaded.  Rapid has a significant history of attempting to use arbitration clauses in transfer agreements to avoid the requirements of state structured protection acts, and numerous federal courts have rejected Rapid's arguments."  *Id.* The Third Circuit similarly noted that Rapid Settlements had a "history of attempting to circumvent state structured settlement protection acts and bind settlement obligors and annuity issuers to

40

arbitrations in which they have not so consented." *Allstate Settlement Corp. v. Rapid Settlements, Ltd.*, 559 F.3d 164, 172 (3d Cir. 2009).   The Third Circuit upheld an injunction that prohibited Rapid Settlements from using arbitration to effectuate transfers with Allstate annuitants. *Id.*  Other courts have upheld injunctions preventing Rapid Settlements from using arbitration to effectuate transfers with individuals holding annuities from Pacific Life Insurance Company and R&Q Reinsurance Company. *See Pacific Life Ins. Co. v. Rapid Settlements*, 309 F. App'x 359 (2d Cir. 2009); *R&Q Reins. Co. v. Rapid Settlements, Ltd.*, No. 06-14329-CIV, 2007 WL 2330899 (S.D. Fla. Aug. 13, 2007).

The evidence in this case, in addition to the evidence submitted in support of Symetra's application for an injunction, strongly supports the injunction that NASP seeks.  NASP has shown that its members are injured by the Rapid Settlements practice of using arbitration to effectuate transfers of future-income payments not approved by a court.  This practice clouds title to the future-payment rights of annuitants against whom Rapid Settlements has obtained an arbitration award, raising transaction costs for NASP members seeking to enter transfer agreements with these annuitants and discouraging NASP members from entering these transactions in the first place. NASP has shown, and the case law has confirmed, that Rapid Settlements circumvents, and violates, the SSPAs by using arbitration awards and subsequent state-court confirmation proceedings to effect transfers to Rapid Settlements of annuitants' future-payment rights without obtaining statutorily required state-court approval of the transfers.  This factor weighs heavily in favor of granting the permanent injunction NASP seeks.

### b.    The FAA Does Not Preempt the SSPAs

Rapid Settlements argues that its use of arbitration procedures to effectuate transfers not approved by a state court is proper because the Federal Arbitration Act preempts the SSPA requirements of state-court approval. This court has already rejected precisely this argument in prior opinions. (*See* Docket Entry No. 84 at 45–58; No. 240 at 26–33). The Fifth Circuit has affirmed. The briefing and arguments Rapid Settlements submitted on NASP's motion for injunction do not raise new issues.

The FAA provides, in relevant part:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The FAA does not preempt the SSPAs because "[n]one of the court findings required by [the SSPAs] prohibits the creation of arbitration rights in a transfer agreement." (Docket Entry No. 240 at 28 (quoting *In re Rapid Settlements*, 202 S.W.3d 456, 460 (Tex. App.–Beaumont 2006, pet. denied)); *see also Allstate Life Ins. Co v. Rapid Settlements, Ltd.*, No. Civ. A. 3:06 cv 00629, 2007 WL 2745806 (S.D. Miss. Sept. 20, 2007); *Allstate Settlement Corp. v. Rapid Settlements, Ltd.*, No. 06-4989, 2007 WL 1377667, at *5 n.4 (E.D. Pa. May 8, 2007) (The SSPAs "do[ ] not prohibit arbitration let alone even mention the issue of arbitrability . . . . [T]he court approval required by the Act is of the transfer agreement, not of the arbitration provision within it.").

As this court noted in its March 31, 2008 order, under the SSPAs, state-court approval is a condition precedent to the effectuation of a transfer of structured settlement payment rights. As a result, Rapid Settlements gains a right to the transfer only after state-court approval is obtained;

before such approval is obtained, there is no right to enforce.  "The scope of an arbitration agreement cannot comprehend an agreement to arbitrate to an award the substantive law clearly prohibits—in this instance, a transfer of structured settlement payment rights without court approval."  *Rapid Settlements, Ltd. v. Symetra Life Ins. Co.*, 234 S.W.3d 788, 800 (Tex. App.–Tyler 2007, no pet.). Nothing in this court's interpretation of the SSPAs limits efforts by a factoring company such as Rapid Settlements to arbitrate claims relating to a transfer agreement, so long as the arbitration is not used, directly or indirectly, to transfer structured settlement payment rights without obtaining court approval for the transfer under the SSPA.  (Docket Entry No. 240 at 31–33).  The FAA presents no barrier to the injunctive relief that NASP seeks.

#### c.  The Arbitration Awards are "Transfers" Under the SSPAs

Rapid Settlements also reargues its argument that the SSPAs do not apply to transfers ordered in arbitration awards because such awards are not "transfers" under the SSPAs.  Under the SSPAs, a "transfer" is any "sale, assignment, pledge, hypothecation, or other alienation or encumbrance of structured settlement payment rights made by a payee for consideration" to a "transferee."  *See, e.g.,* TEX. CIV. PRAC. & REM. CODE § 141.002(18), (21).  Rapid Settlements argues that this definition excludes the arbitration awards that it obtains, because these awards, ostensibly for "breach" of the transfer agreements, are not voluntarily made by the annuitant but instead are ordered by the arbitrator, and are not "for consideration" but instead are damages for a breach.  (Docket Entry No. 238 at 9–11).  This court has already rejected this argument.  (Docket Entry No. 240 at 34–36).

The SSPAs require state-court approval of a proposed "transfer."  The evidence shows that Rapid Settlements uses arbitration awards to obtain a payee's future-payment rights without the

necessary state-court approval.  If the arbitrator awards Rapid Settlements all or part of the payee's future-payment stream, either to enforce the proposed transfer agreement, or as "lost profits" or "damages," Rapid Settlements receives the same payments that the payee would have transferred if a state court had approved the proposed transfer agreement under the SSPA.  The fact that an arbitrator orders the payee to have the payments made to Rapid Settlements does not obscure the basis for the order.  Rapid Settlements entered into a contract in which the payee "proposed to make the transfer" to Rapid Settlements, for consideration.  The arbitration awards at issue are "transfers" under the SSPAs.

At the NASP injunction hearing, Rapid Settlements also argued that an arbitration award that effects a transfer of a future-payment stream to pay for a damages award for breach of contract falls outside the scope of the SSPAs, like federal tax liens, child-support orders, bankruptcy court orders, and other court orders that require an annuity issuer to redirect structured settlement payments from the original payee to a third party.  (Docket Entry No. 238 at 30–53).  Rapid Settlements previously raised this argument and this court rejected it.  Federal tax liens, child-support payments, and similar orders are not "transfers" under the SSPA because they are not based on an agreement proposed by the payee to sell structured-settlement payments to the parties obtaining the orders, for consideration. The SSPAs were not enacted to protect structured settlement recipients from paying child support or creditors (other than creditors that are factoring companies seeking to avoid the SSPA requirements).  (Docket Entry No. 240 at 34–36, 40–41).  The orders Rapid Settlements obtains through improper use of arbitration are far different from federal tax liens and child-support orders.  The arguments Rapid Settlements makes about the nature of a "transfer" do not present a barrier to the injunctive relief that NASP seeks.

### 2.      There is No Adequate Remedy at Law

NASP has shown that it will be irreparably harmed without injunctive relief because  the cloud on title that Rapid Settlements's arbitration awards create—an encumbrance that is improper under the SSPAs—significantly raises transaction costs for NASP members who seek to enter transfer agreements with annuitants who have previously entered into proposed transfer agreements with Rapid Settlements.  The specter of increased transaction costs also discourages NASP members from pursuing legitimate proposed transfers with annuitants.  The increased transaction costs for NASP members, and the potential financial advantages that Rapid Settlements enjoys by avoiding the requirement in the SSPAs that a court find that a proposed transfer is in the annuitant's best interests, place NASP members at a competitive disadvantage.  NASP has also produced evidence that the improper use of arbitration by Rapid Settlements to circumvent the SSPAs threatens the legislative balance that NASP assisted in crafting and may prompt additional legislation that further curtails or prohibits the factoring industry.

"[A] legal remedy may be deemed inadequate . . . if plaintiff demonstrates that effective legal relief can be secured only by a multiplicity of actions, . . . so that plaintiff would be required to pursue damages each time he was injured."  11A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2944, at 89–90 (2d ed. 1995).  Injunctive relief is appropriate when "a plaintiff can secure legal relief only through a multiplicity of lawsuits."  *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991) (citing *Wilson v. Ill. S. Ry. Co.*, 263 U.S. 574, 576–77 (1924)).  Requiring NASP members to pursue litigation for damages against Rapid Settlements every time it asserts a claim to an annuitant's future-income payments as the result of an arbitration award would not reduce the increased transaction costs.  Nor would it address the fact that NASP members are

45

discouraged by the practices Rapid Settlements follows from entering into legitimate transfer agreements with individuals who have previously entered into proposed transfer agreements with Rapid Settlements.  Requiring NASP members to pursue litigation for damages under these circumstances would not address the concern that the practices Rapid Settlements follows could prompt legislatures to enact stricter legislation.  Indeed, an avalanche of litigation of the type of which NASP complains, resulting from the improper business practices pursued by Rapid Settlements, could support the need for additional and more restrictive rules for the factoring industry in general.

The injuries to NASP and its members have no adequate legal remedy.  This weighs in favor of granting a permanent injunction.

### 3.    The Balance of Hardships and the Public Interest Favor Injunction

At the Symetra injunction hearing, Rapid Settlements confirmed that it uses arbitration in a small percentage of its structured settlement transfers, stating that over a period of more than three-and-a-half years, "arbitrations are probably five to seven percent of the files of Rapid."  (Docket Entry No. 213 at 11).  Because the arbitrated transfers make up a relatively small percentage of Rapid Settlements's business, a permanent injunction would not cause such hardship to Rapid Settlements as to weigh against granting such relief.

The permanent injunction NASP seeks would serve the public interest.  The SSPAs require court approval before a proposed transfer takes effect, to protect structured settlement recipients who are "in need of cash from exploitation by factoring companies." *Johnson v. Structured Asset Servs., L.L.C.*, 148 S.W.3d 711, 729 (Tex. App.–Dallas 2004, no pet.).  As numerous courts have now held, the use of arbitration by Rapid Settlements thwarts this purpose by effecting a transfer of an

46

annuitant's future-payment stream without the court oversight that the SSPAs require.  *See Symetra*

*Life Ins. Co. v. Rapid Settlements, Ltd.*, --- F.3d ---, 2009 WL 1277736 (5th Cir. May 11, 2009);

*Allstate Life Ins. Co. v. Rapid Settlements Ltd.*, No. 08-60685, 2009 WL 1175534 (5th Cir. May 1,

2009); *Allstate Settlement Corp v. Rapid Settlements, Ltd.*, 559 F.3d 164 (3d Cir. 2009); *Pacific Life*

*Ins. Co. v. Rapid Settlements, Ltd.*, 309 F. App'x 459 (2d Cir. 2009); *R&Q Reins. Co. v. Rapid*

*Settlements, Ltd.*, 2007 WL 2330899 (S.D. Fla. Aug. 13, 2007); *Rapid Settlements, Ltd. v. Green*, ---

S.W.3d ---, 2009 WL 1688385 (Tex. App.–Houston [1st Dist.] 2009, no pet. h.); *Transamerica*

*Occidental Life Ins. Co. v. Rapid Settlements, Ltd.*, --- S.W.3d ---, 2008 WL 5263265 (Tex.

App.–Houston [1st Dist.] 2008, mandamus denied).

This court has found that the public interest would be served by enjoining Rapid Settlements

from using arbitration against Symetra annuitants to effect transfers of future-payment rights that

have not been approved by a state court.  An expansion of this injunction  to prohibit Rapid

Settlements from using such practices against any annuitants is in the public interest.  The balance

of hardships and the public interest factors weigh heavily in favor of granting a permanent

injunction.

### 4.        NASP Does Not Have Unclean Hands

Rapid Settlements argues that many NASP members include arbitration agreements in their

proposed transfer agreements and provide annuitants advances under the proposed transfer

agreements that they later seek to recoup.  As a result, according to Rapid Settlements, NASP has

unclean hands and cannot obtain the relief it seeks.

"The unclean hands doctrine is used to defeat an undeserving plaintiff's claim for equitable

relief against a defendant that he has injured."  *Positive Black Talk Inc. v. Cash Money Records*, 394

F.3d 357, 379 (5th Cir. 2004) (citing *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979)).   The doctrine of unclean hands applies "when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001); *Mitchell Bros.*, 604 F.2d at 863 (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).

The argument that many NASP members also include arbitration provisions in their proposed transfer agreements, in absence of any evidence that NASP members have invoked these arbitration provisions to effectuate transfers of future-payment rights not approved by a court, provides no basis for an unclean-hands defense.   The presence of arbitration provisions in proposed transfer agreements does not raise an issue under the SSPAs.   The problem is the use of arbitration provisions to effectuate the transfer of future-payment rights in the absence of the court approval required by the SSPAs.   Rapid Settlements has not alleged or presented any evidence that NASP members have pursued arbitration to effectuate the transfer of future-payment rights not approved by a state court.

The argument that NASP members have unclean hands because they provide annuitants advances that they later seek to recoup fares no better.   Rapid Settlements has not alleged or presented any evidence that NASP members have asserted annuitants' failure to repay such advances as a basis for invoking arbitration to effectuate a transfer of annuitants' future-payment rights.   There is evidence that certain NASP members will seek to recover  advances paid to an annuitant who did not finalize an agreement with that member by asking for repayment from the factoring company that does reach a transfer agreement with that annuitant.   But the uncontroverted evidence shows that

these actions are taken to recoup only the amount advanced, while Rapid Settlements would use the failure to repay the amount advanced as a basis for arbitration to effectuate a transfer of future-payment rights by asserting a claim for "damages" or "attorneys' fees."  (Docket Entry Nos. 213 at 59, 238 at 113–19).  And the evidence showed that NASP members will not pursue litigation for the return of an advance made under a post-SSPA proposed transfer agreement if this request is denied. (Docket Entry No. 235 at 75–88).  The only example in the record of a NASP member pursuing litigation to obtain repayment of an advance involved an advance given under a pre-SSPA agreement, and the demand sought only the $1,400 advanced, not additional money or penalties. (Rapid Binder, Ex. 228 at 4 n.2).

NASP is not barred by unclean hands from seeking an injunction against the use of arbitration by Rapid Settlements to effectuate transfers of future-payment rights without the approval of the state courts under the SSPAs.

### B.      Findings and Conclusions on Enjoining Rapid Settlements from Enforcing Rights of First Refusal and Security Interests in Future-Payment Rights That Have Not Been Approved by a Court Under the SSPAs.

NASP also seeks a permanent injunction prohibiting Rapid Settlements from enforcing rights of first refusal or security interests in transfer agreements if those rights and interests have not been approved by a state court under the applicable SSPA.  NASP contends that Rapid Settlements asserts such rights and interests to prevent annuitants from entering transfer agreements with other factoring companies and to induce annuitants to enter transfer agreements with Rapid Settlements instead. NASP also contends that in some cases Rapid Settlements uses rights of first refusal or security interests in a proposed agreement to invoke arbitration based on an annuitant's "breach" of these provisions, to effectuate the transfer of future-payment rights without court approval.

49

NASP contends that by asserting rights of first refusal and security interests, Rapid Settlements clouds title to annuitants' payment rights, raising the transaction costs and discouraging NASP from doing business with annuitants who have previously entered a transfer agreement with Rapid Settlements. NASP also contends that the assertion of these rights and interests puts its members at a competitive disadvantage and threatens the legislative balance represented by the SSPAs in ways that may lead to more restrictive legislation.

Rapid Settlements argues that the SSPAs do not apply to rights of first refusal and security interests in the portions of an annuitant's future-payment rights that are not the subject of a proposed transfer agreement. Rapid Settlements argues that rights of first refusal and security interests are therefore not "transfer[s] of structured settlement payment rights," the subject of protection under the SSPAs. Rapid Settlements also presents an unclean-hands defense, arguing that NASP has an anticompetitive motive. Rapid Settlements asserts that many NASP members use proposed transfer agreements that contain rights of first refusal and security interests. Rapid Settlements contends that many NASP members have taken steps to enforce such rights and interests, even when these rights and interests have not been approved by a state court under the applicable SSPA.

### 1.    NASP Has Demonstrated Success on the Merits and Irreparable Injury

NASP contends that the Rapid Settlements practice of enforcing rights of first refusal and security interests that have not been approved by a state court violates the SSPAs. Rapid Settlements counters that transfers of rights of first refusal and security interests are not subject to the SSPAs. (Docket Entry No. 228 at 14–19). The argument Rapid Settlements raises is unpersuasive.

Rapid Settlements argues that rights of first refusal and security interests are not "transfers" because they do not absolutely prevent other parties from later purchasing the future-income payments to which these rights and interests attach.  But the plain language of the SSPAs defeats this argument.  These statutes require court approval not just for the sale of structured settlement payment rights, but also to the "pledge, hypothecation, or other alienation or encumbrance of structured settlement payment rights."  *See, e.g.*, TEX. CIV. PRAC. & REM. CODE §§ 141.002(18), 141.004.[15]  If a factoring company enforces its right of first refusal on future-payment rights, particularly when coupled with the ten percent penalty as the Rapid Settlements transfer agreements provide, it encumbers those rights.  Enforcement of security interests in future payments creates a similar encumbrance.  The security interests do not fall within the statutory exception for "blanket security agreements" with "insured depository institutions."  Rapid Settlements is not an insured depository institution, and its actions to enforce its security interests in structured settlement future payments seek to redirect those payments to Rapid Settlements.  The security interests also qualify as hypothecations, "[t]he pledging of something as security without delivery of title or possession."

---

[15]  The SSPAs require court approval for "direct or indirect transfer[s] of structured settlement payment rights."  TEX. CIV. PRAC. & REM. CODE § 141.004.  "Structured settlement payment rights" are defined as "rights to receive periodic payments under a structured settlement."  *Id.* § 141.002(16).  A "transfer" is defined as:

> any sale, assignment, pledge, hypothecation, or other alienation or encumbrance of structured settlement payment rights made by a payee for consideration, except that the term does not include the creation or perfection of a security interest in structured settlement payment rights under a blanket security agreement entered into with an insured depository institution, in the absence of any action to redirect the structured settlement payments to the insured depository institution, or its agent or successor in interest, or to enforce the blanket security interest against the structured settlement payment rights.

*Id.* § 141.002(18).

51

BLACK'S LAW DICTIONARY at 759 (8th ed. 2004); *see also In re Rapid Settlements Ltd.*, 136 P.3d 765, 770 (Wash. App. 2006) ("[T]he right to file financing statements is a hypothecation of the [annuitants'] rights to their periodic payments."). The encumbrances and hypothecations created by rights of first refusal and security interests are for consideration.

Rapid Settlements cites *Coffey v. Singer Asset Finance Co.*, 223 S.W.3d 559, 570 (Tex. App.–Dallas 2007, no pet.), for the proposition that a security interest is not an "assignment or commutation" of structured settlement payment rights. Reliance on this case is misplaced. The transfer agreement in *Coffey* was signed before the September 1, 2001 effective date of the Texas SSPA, which only applies to transfer agreements entered after that effective date. TEX. CIV. PRAC. & REM. CODE § 141.007(e). The *Coffey* court therefore did not consider whether the SSPA applied. 223 S.W.3d at 570 n.12. Instead, that court concluded that the Texas Insurance Code's provisions against assignment or commutation of benefits did not apply. *Id.* at 563–64 (citing TEX. INS. CODE art. 21.22).

Rapid Settlements argues in the alternative that its rights of first refusal do not vest as "interests" in structured settlement payments until another party offers to purchase the annuitant's future-income payments. As a result, according to Rapid Settlements, a court must approve the right of first refusal only if Rapid Settlements exercises its option to purchase an additional portion of the annuitant's future-income stream. But this ignores the plain language of the SSPAs, which require court approval of any encumbrance of a structured settlement payment right. Rights of first refusal encumber structured settlement payment rights from the time they are first granted. And the record shows that despite its argument, Rapid Settlements does not seek court approval when it does enforce its right of first refusal.

Courts considering the issue have concluded that rights of first refusal and security interests are structured settlement payment rights for which court approval is required under the SSPAs.  In *Fidelity and Guaranty Life Insurance Co. v. Harrod*, 2007 WL 2847966, for example, the Maryland district court rejected the argument made by Rapid Settlements that Lucille Harrod's transfer agreement with Peachtree, which was approved by a Florida state court, should not go forward because Harrod had previously signed a transfer agreement with Rapid Settlements, never approved by a state court under the applicable SSPA, that purported to give Rapid Settlements a security interest in all of Harrod's future-income payments.  The court held that Rapid Settlements "could not have obtained a valid interest in the payments because it did not obtain court approval for the transfer of an interest in structured settlement payments," as the Florida SSPA required.  *Id.* at *4. "Clearly, the statute encompasses the type of agreement that Rapid alleges it entered into with Mrs. Harrod: a grant of a 'first priority security interest . . . in [Mrs. Harrod's] rights to and interest in payments due under the Annuity Contract and/or Settlement Agreement.'"  *Id.*

In *In re Rapid Settlements Ltd.*, 136 P.3d at 770, Rapid Settlements again unsuccessfully defended its rights of first refusal and security interests in proposed transfer agreements.  The Washington state court concluded that the transfer of these rights was invalid because it had not been approved by a state court under the applicable SSPA.  The court concluded that rights of first refusal and security interests were subject to the court- approval requirement under the applicable SSPA because these provisions "encumber[ed] all of the [annuitants'] periodic payments."  The court explained:

> The agreements authorize Rapid to file financing statements over all of the payees' periodic payments to "secure Rapid Settlements's rights hereunder."  One right Rapid has under the transfer agreement is, as noted, the right of first refusal.  That right includes the right to

> have the payee direct any purchaser to pay Rapid 10 percent of any
> amount transferred in violation of Rapid's first refusal right. Because
> all of the periodic payments secure these rights, a payee's breach of
> Rapid's right of first refusal could result in Rapid's interference with
> that Payee's right to receive future payments.

*Id.* The court concluded that "Rapid has no valid security interest until the transfer agreements have

been approved by a final court order." *Id.* at 771.

In *Rapid Settlements, Ltd. v. Symetra Life Ins. Co.*, 234 S.W.3d at 800, the Texas appellate

court similarly refused to recognize a Rapid Settlements security interest in an annuitant's future-

payment rights. Rapid Settlements asserted its security interest based on a transfer agreement and

subsequent promissory note and advance, neither of which was approved under the Texas SSPA.

The court held that "[t]he creation of a security interest in structured settlement payments . . . is

clearly a transfer as defined by section 141.002(18) of the [Texas] SSPA. The transfer cannot be

effective without final approval by the [state] court based on express findings." *Id.*

Other courts have denied motions by Rapid Settlements seeking approval of a proposed

transfer agreement because the agreement stated that the right of first refusal and security interest

would persist even if the transfer was not consummated. The courts concluded that this provision

violated the applicable SSPAs. A Florida appellate court concluded that the Rapid Settlements

proposed transfer agreement violated the Florida SSPA because it "purport[ed] to grant Rapid a right

of first refusal and other interests in [the annuitant's] structured settlement payments, even before

any court acts on the Petition, and even if a court were to deny the petition." *In re Approval of*

*Transfer of Structured Settlement Payment Rights*, No. 05-010839, 2005 WL 3963846, at *2 (Fl. Cir.

Ct. Nov. 7, 2005). The court concluded that the SSPA made clear that this type of transfer "'is not

effective . . . unless the transfer is authorized in advance in a final order by a court of competent

jurisdiction . . . .'" *Id.* (quoting FLA. STAT. § 626.99296(3)(a)). A Pennsylvania state court similarly rejected a proposed Rapid Settlements transfer agreement because "[t]he proposed transfer agreement contains provisions that purport to bind [the annuitant], and purport to grant Rapid a security interest and right of first refusal and other interests in the structured settlement payments, even before any court acts on the petition, and even if a court were to deny the petition, in violation of the [Pennsylvania SSPA], which provides that transfers are not effective without court approval." *In re Transfer of Structured Settlement Rights by Phillips*, No. 3994, 2005 WL 2008405 (Pa. Com. Pl. July 22, 2005).

NASP has established that by asserting rights of first refusal and security interests not approved by a court, Rapid Settlements violates the SSPAs.

### 2.      There is No Adequate Remedy at Law

NASP has shown that its members will be irreparably harmed absent injunctive relief because by asserting its rights of first refusal and security interests without court approval, Rapid Settlements clouds title to annuitants' future-payment rights and raises transaction costs for NASP members seeking to enter transactions with these annuitants. The evidence showed that NASP members must participate in protracted litigation and pay additional attorneys' fees to overcome the assertion by Rapid Settlements of a right of first refusal. The cloud on title and threats by Rapid Settlements to enforce its rights of first refusal or its security interests discourages NASP members from entering into such transactions in the first place and may convince annuitants to abandon proposed transactions with factoring companies other than Rapid Settlements. The improper encumbrances caused by Rapid Settlements asserting rights of first refusal and security interests not approved by a court under the applicable SSPA have caused distinct injury to NASP and its

members.  These business practices on the part of Rapid Settlements will continue to cause NASP and its members injury absent injunctive relief.

Rapid Settlements asserts that an injunction is not warranted because NASP members have a legal remedy: a cause of action for tortious interference with existing or prospective contracts. This argument ignores the inadequacy of such a remedy.  Injunctive relief is appropriate when "a plaintiff can secure legal relief only through a multiplicity of lawsuits," *Ecolab*, 753 F. Supp. at 1110, "so that plaintiff would be required to pursue damages each time he was injured," 11A WRIGHT *ET AL.*, FEDERAL PRACTICE & PROCEDURE § 2944. Requiring NASP members to pursue litigation against Rapid Settlements for tortious interference every time it asserts a right of first refusal or security interest not approved by a court would not prevent the improper assertion of such rights and interests.  Requiring NASP members to pursue such litigation continues the unnecessary and harmful costs and burdens on NASP, its members, and annuitants.  This factor weighs in favor of granting a permanent injunction.

### 3.    The Balance of Hardships and the Public Interest Favor Injunction

The record shows that Rapid Settlements routinely includes a right of first refusal and security interest in its proposed transfer agreements.  The record also shows that Rapid Settlements frequently seeks to enforce these rights and interests to attempt to frustrate an annuitant's agreement to transfer future-payment rights to another factoring company, even when no court has approved what Rapid Settlements asserts.   The injunctive relief that NASP seeks—requiring Rapid Settlements to refrain from enforcing these rights and interests unless a court has approved them under the relevant SSPA—is merely consistent with what the law requires.  This requirement would not impose an undue hardship on Rapid Settlements and would serve the public interest.  The SSPAs

56

require court approval of any proposed transfer of an interest in structured settlement payment rights, including a right of first refusal or a security interest, to protect structured settlement recipients who are "in need of cash from exploitation by factoring companies." *Johnson v. Structured Asset Servs., L.L.C.*, 148 S.W.3d at 729.  The clear consensus in the case law is that by asserting rights of first refusal and security interests not approved by a court, Rapid Settlements thwarts this purpose and evades the court oversight the SSPAs require.  *See Fidelity and Guaranty Life Insurance Co. v. Harrod*, 2007 WL 2847966; *In re Rapid Settlements Ltd.*, 136 P.3d at 770; *Rapid Settlements, Ltd. v. Symetra Life Ins. Co.*, 234 S.W.3d at 800; *In re Approval of Transfer of Structured Settlement Payment Rights*, 2005 WL 3963846, at *2; *In re Transfer of Structured Settlement Rights by Phillips*, 2005 WL 2008405, at *1.  Enjoining Rapid Settlements from enforcing rights of first refusal and security interests that have not been approved by a court under the applicable SSPA would serve the public interest.

The balance of hardships and the public interest factors weigh in favor of granting a permanent injunction.

### 4.   NASP Does Not Have Unclean Hands

Rapid Settlements spent a significant portion of the injunction hearing seeking to support its argument that equitable relief is inappropriate because NASP members also include rights of first refusal and security interests in their proposed transfer agreements and enforce those rights.  Rapid Settlements characterizes NASP's request for injunctive relief as an anticompetitive measure designed to drive it from the factoring industry.  NASP responds that its members do not engage in the behavior that is the subject of its application for an injunction against Rapid Settlements.

The evidence shows that after the SSPAs were enacted, at least some NASP members continued to use transfer agreements with rights of first refusal in annuitants' future-payment rights that ostensibly "survive the exercise of any right of cancellation or rescission that Seller or Purchaser may have under this Agreement, or applicable law." *See, e.g*, Rapid Binder, Ex. 197 ¶ 11.15; Ex. 198 ¶ 10; Ex. 200 ¶ 11; Ex. 230-A ¶ 4.9. These transfer agreements also claim a security interest in the annuitants' future-income payments. (*Id.*, Ex. 197 ¶ 4.3; Ex. 198 ¶ 11; Ex. 200 ¶ 13; Ex. 230-A ¶ 4.2). Rapid Settlements contends that these transfer agreements are evidence that NASP members engage in the practices that NASP is suing to prevent Rapid Settlements from pursuing. NASP responds that it is not seeking an injunction against the mere presence of such provisions in the Rapid Settlements transfer agreements. Instead, NASP argues that it is seeking to enjoin Rapid Settlements from enforcing these rights and interests when they have not been approved by a state court under the applicable SSPA. NASP asserts that its members do not generally engage in such practices with respect to transfer agreements entered after the SSPAs were enacted. The record supports NAPS's assertion.

Rapid Settlements points to UCC financing statements filed by Stone Street claiming rights of first refusal and security interests in annuitants' entire annuity payments, even though only a portion of those annuity payments were purchased under the Stone Street transfer agreement. (*See, e.g.*, Rapid Binder, Ex. 242). But Rapid Settlements has provided no evidence as to the approval status of the transfer agreements related to these security filings. And there is no evidence of additional efforts by Stone Street to enforce those rights and interests, consistent with the evidence presented by NASP that its members do not engage in such practices.

Rapid Settlements also points to several letters that it received from NASP-member Settlement Capital. These letters stated that Settlement Capital "has a security interest in all payments due under the structured settlement." But these letters did not contain any specific threat of legal enforcement. These letters also attached court orders approving under the applicable SSPAs the transfer agreements in which these security interests were taken. (Rapid Binder, Exs. 184, 205, 207).

Rapid Settlements also elicited testimony from Gary Hall, a sales manager for NASP-member First Providen, that although First Providen will not take legal action to enforce a right of first refusal, First Providen does not inform annuitants of this fact unless they ask. Without suggesting that such an approach is appropriate, it does not rise to the level of the conduct engaged in by Rapid Settlements.

Rapid Settlements also introduced evidence of NASP members taking legal action to enforce rights of first refusal and security interests in pre-SSPA transfer agreements. But, as NASP correctly points out, these examples are not relevant to the propriety of actions taken to enforce provisions of transfer agreements entered into after the SSPAs became effective. The SSPAs do not apply to structured settlement payment rights transferred before the SSPAs became effective. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 141.007(e) ("Nothing contained in this chapter may be construed . . . to imply that any transfer under a transfer agreement entered into before the effective date of this chapter is valid or invalid."). The record strongly contradicts the assertion by the CEO of Rapid Settlements that it is merely "doing the exact same thing that other people in the industry are doing." (Docket Entry No. 235 at 24–25). The conduct in which Rapid Settlements has engaged is significantly different in degree and in kind than what NASP members are doing. The record

59

contains numerous examples of Rapid Settlements invoking rights of first refusal or security interests, not approved by a court under the applicable SSPA, to intervene in court proceedings, as in the Keith Thurston matter; to initiate arbitration against annuitants, as in the Simmie King and Lucille Harrod matters; and to threaten legal action against other factoring companies or annuitants, as in the Kenneth Gross matter.  By contrast, none of the examples of "enforcement" by NASP members of post-SSPA rights of first refusal and security interests  involved the pursuit or threat of legal action.  And many of the instances of "enforcement" by NASP members Rapid Settlements identified related to rights of first refusal or security interests for transfers approved by a court under the applicable SSPA.

The doctrine of unclean hands applies "when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001).  "The maxim of unclean hands is not applied where [the] plaintiff's misconduct is not directly related to the merits of the controversy between the parties."  *Mitchell Bros.*, 604 F.2d at 863.  The doctrine may be "relaxed if defendant has been guilty of misconduct that is more unconscionable than that committed by plaintiff."  11A WRIGHT *ET AL.*, FEDERAL PRACTICE & PROCEDURE § 2946, at 112.  The evidence of post-SSPA efforts by NASP members to enforce rights of first refusal or security interests shows that it is different in kind and much less in quantity than the evidence of the business practices engaged in by Rapid Settlements.

There is no unclean hands barrier to the injunctive relief that NASP seeks.

### 5.	The Proper Scope of the Injunction

60

NASP seeks to enjoin Rapid Settlements from enforcing rights of first refusal or security interests "without first expressly seeking and receiving court approval under an applicable state transfer statute."  The Texas SSPA is typical.  It requires that in a "direct or indirect transfer of structured settlement payment rights," which includes a transfer of rights of first refusal or a security interest, the state court must make "express findings" that:

    (1)    the transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents;

    (2)    the payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received the advice or knowingly waived the advice in writing; and

    (3)    the transfer does not contravene any applicable statute or an order of any court or other governmental authority.

TEX. CIV. PRAC. & REM. CODE § 141.004.  A specific description of rights of first refusal and security interests is a required component of the disclosure statement that must be presented to the annuitant before the transfer is approved.  *See, e.g., id.* § 141.003(1) ("[T]he transferee shall provide to the payee a separate disclosure statement . . . that states . . . the amounts and due dates of the structured settlement payments to be transferred.").  A failure to include such provisions in the disclosure statement is a basis for a court to reject a proposed transfer.  *See In re Rapid Settlements*, 136 P.3d at 769–771 (reversing state-court approval of transfer agreement because the Rapid Settlements disclosure statements to the annuitants did not disclose rights of first refusal, penalties, or security interests present in the proposed transfer agreements).  The  court must determine whether the proposed "transfers" of "structured settlement payment rights"—which include rights of first refusal and security interests—are in the annuitant's best interest. *Id.* § 141.004.  Texas courts have held that "[t]he creation of a security interest in structured settlement payments . . . is

clearly a transfer as defined by section 141.002(18) of the SSPA.  The transfer cannot be effective without final approval by the court based on express findings." *Rapid Settlements, Ltd. v. Symetra Life Ins. Co.*, 234 S.W.3d at 800.  When courts conclude that a proposed transfer that includes rights of first refusal or security interests is not in the annuitant's best interests the transfer is denied.  *See, e.g., In re Approval of Transfer of Structured Settlement Payment Rights*, 2005 WL 3963846, at *2; *In re Transfer of Structured Settlement Rights by Phillips*, 2005 WL 2008405, at *1.  The injunction NASP seeks is consistent with the court opinions under the applicable SSPAs.

### C.      Conclusions[16]

Rapid Settlements uses arbitration to circumvent the SSPAs.  The arbitration awards that Rapid Settlements has obtained have improperly circumvented the applicable SSPAs, regardless of whether the arbitration award purported to award damages for lost profits and attorney's fees and collection costs, or purported to order a garnishment or turnover of payments to satisfy a damages award.  The SSPAs apply to the transfers effectuated by these arbitration awards.  Obtaining state-court confirmation of an arbitration award that effects a transfer of future-payment rights does not equate to obtaining state-court approval of the proposed transfers under the SSPAs.

Rapid Settlements improperly enforces rights of first refusal and security interests in transfer agreements that have not been approved by a state court under the applicable SSPA. Rights of first refusal and security interests in annuitants' future-payment rights are "structured settlement payment rights" under the SSPAs.  Under the SSPAs, a court must approve the transfer of structured settlement payments before the transfer is legally enforceable.  The Rapid Settlements practice of

---

[16]  To the extent any of the conclusions of law are findings of fact, they should also be considered findings of fact.  To the extent any of the findings of fact are conclusions of law, they should also be considered conclusions of law.

bringing legal actions in court or arbitration, or threatening such legal actions, to enforce rights of first refusal or security interests not approved by a court violates the SSPAs.

The practices Rapid Settlements follows cloud title to annuitants' future-payment rights, raise transaction costs for other factoring companies that seek to purchase payments from those future-payment streams, discourage other factoring companies from pursuing such transactions in the first place, and threaten the legislative balance that allows secondary structured settlement transfers while protecting annuitants from aggressive and unscrupulous factoring companies.

The unclean hands defense Rapid Settlements raised does not weigh against the injunctive relief NASP seeks.  Rapid Settlements has not shown that NASP members invoke arbitration to effectuate transfers of future-payment streams not approved by a state court under the applicable SSPA.  Rapid Settlements has not shown that NASP members enforce rights of first refusal or security interests in post-SSPA transfer agreements not approved by a court under the applicable SSPA.

An injunction would serve the public interest.  Using arbitration to effectuate a transfer of all or part of an annuitant's future payments, when a state court has either refused to approve such a transfer agreement under the applicable SSPA or such approval has not been pursued or obtained, is contrary to the laws of almost all the states.  Enforcing rights of first refusal or security interests in a transfer agreement, when a state court has either refused to approve the transfer of such rights under the applicable SSPA or such approval has not been pursued or obtained is likewise contrary to the laws of almost all the states.  An injunction would serve the public interest by precluding further illegal practices by Rapid Settlements, preventing Rapid Settlements from attempting to use

arbitration, rights of first refusal, and security interests to accomplish what "the substantive law clearly prohibits." *Rapid Settlements*, 234 S.W.3d at 800.

Rapid Settlements is enjoined from using arbitration to resolve disputes between it and any annuitant, if that arbitration, directly or indirectly, effectuates a transfer of all or part of the annuitant's future-payment rights, unless a state court has approved the transfer as required under the applicable state structured settlement protection act.

Rapid Settlements is  enjoined from pursuing legal action in court or in arbitration, or from threatening such action, to enforce rights of first refusal or security interests, unless a state court has approved the transfer of those rights or interests as required under the applicable state structured settlement protection act.

An order granting permanent injunction is separately issued.

SIGNED on July 28, 2009, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge